# United States Tax Court

T.C. Memo. 2024-52

BUCKELEW FARM, LLC f.k.a. BIG K FARMS LLC,
BIG K LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 14273-17.                    Filed April 25, 2024.

————

*Lynn Ernest Fowler*, *Burleigh L. Singleton*, *Jeffrey S. Reed*, and *Ava J. Conger*, for petitioner.

*Keith Lawrence Gorman*, *Randall S. Trebat*, *Elizabeth C. Mourges*, *Kirsten E. Brimer*, *John Anthony Guarnieri*, and *Nicole M. Connelly*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: This case involves a noncash charitable contribution deduction claimed in 2013, the tax year at issue. By notice of final partnership administrative adjustment (FPAA), respondent disallowed a charitable contribution deduction claimed by Buckelew Farm, LLC, formerly known as Big K Farms, LLC (Big K Farms or Partnership), for its grant to the Southeast Regional Land Conservancy, Inc. (SERLC), of a perpetual conservation easement over approximately 1,545.79 acres of real property located in Jones County, Georgia. Respondent determined that the Partnership is subject to a civil fraud

[*2] penalty pursuant to section 6663,[1] or, alternatively, that a section 6662 accuracy-related penalty applies.

After concessions,[2] the issues for decision are (1) whether the Partnership satisfied the requirements of section 170 for its claimed conservation easement donation, (2) the fair market value of the conservation easement, (3) whether the civil fraud penalty under section 6663 applies, or, in the alternative, (4) whether an accuracy-related penalty pursuant to section 6662 is applicable.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. The Stipulation of Facts and the attached Exhibits are incorporated herein by this reference.

Big K Farms is a limited liability company (LLC) treated as a partnership under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, for federal income tax purposes; petitioner, Big K, LLC (Big K), is its tax matters partner (TMP).[3] Big K Farms is a Georgia LLC, with its principal place of business in Atlanta, Georgia. James M. Adams III is the designated representative of the TMP.

I.    *The Subject Property and Ownership History*

On January 4, 1999, former professional major league baseball players Ryan Klesko and John Smoltz formed the Partnership as a Georgia LLC, with each member holding a 50% interest. The Articles of Organization of the Partnership were signed on December 9, 1998. Mr. Klesko and Mr. Smoltz were both managers of the Partnership from formation until December 12, 2013. At some point before December 2013 Mr. Smoltz transferred his 50% interest in the Partnership to his wife,

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] By way of Stipulations of Settled Issues the parties agree that the conservation easement at issue satisfies one of the conservation purposes defined in section 170(h)(4) and that respondent has complied with the procedural requirements set forth in section 6751(b) for all penalties asserted under sections 6662 and 6663.

[3] Before its repeal TEFRA governed the tax treatment and audit procedures for many partnerships, including Big K Farms.

[*3] Kathryn Smoltz, for estate and financial planning purposes unrelated to this case. Additionally, Mr. and Mrs. Smoltz have been retaining John Dodd as their personal financial advisor since 2012.

Between 1998 and 2006 the Partnership acquired eight parcels of land in Jones County, Georgia, for $4,014,000,[4] consisting of approximately 1,561.65 acres. These parcels are bordered by Upper River Road, McKay Road, and Stirk Road. The eight parcels of land constitute the Subject Property. The Partnership purchased the land for its timber value and for various recreational uses including hunting, fishing, and other outdoor sporting activities. It continued the recreational uses until 2013. On December 18, 2013, 5.32 acres of the Subject Property were transferred to Mr. Klesko.

A.      *Prior Listings of the Subject Property*

By 2012 the Partnership was actively trying to sell the Subject Property, listing it with a broker, Matt Haun, for $9 million. Mr. Haun is the owner of Quality Timber & Wildlife Management, Inc., and is a real estate agent with Mossy Oak Properties, which specializes in large hunting parcels. Mr. Klesko initially wanted to list the Subject Property for $14 million; however, Mr. Haun informed him that current market conditions could not support such a price.

Mr. Haun listed the Subject Property twice for Mr. Klesko and Mr. Smoltz, and it was on the market for 6 to 12 months. The Subject Property was listed on Mr. Haun's company website and through other online publications. Mr. Haun noted that properties of this size are "extremely hard to move simply [because] of the acquisition and inability . . . to borrow." Despite the Subject Property's being one of a kind, Mr. Haun explained that for the "current asking price [of $9 million] a buyer could purchase a plantation in south [Georgia] that's [three] times bigger, which makes a difficult sale," and noted that if forced to sell it, he would expect the Subject Property to fetch between $3 million and $3.5 million.

---

[4] On December 17, 1998, two of the parcels were purchased for $550,000 (294.21 acres) and $2,550,000 (975.28 acres). In September 2002 the Partnership purchased a single parcel of land for $694,000 (286.32 acres). In July 2006 the Partnership purchased a single parcel of land for $10,000 (0.52 acre). On August 18, 2005, the Partnership purchased three parcels of land for $70,000 (1.52 acres), $45,000 (1.79 acres), and $65,000 (1.78 acres). Lastly, on July 22, 2005, the Partnership purchased a single parcel of land for $30,000 (0.23 acre). The aggregate of these amounts, $4,014,000, constitutes the original purchase price of the Subject Property.

[*4] In addition to the online listings Mr. Haun contacted a lumber company and a large landholder to determine their interest in the Subject Property, but neither expressed any interest. Ultimately, Mr. Haun did not receive any concrete offers[5] or interest in the Subject Property from potential buyers.

B. *Prior Appraisals of the Subject Property*

The Partnership borrowed money in or around 2010 and used the Subject Property as collateral. The banks holding the mortgages engaged several independent appraisers to value the Subject Property and obtained appraisals in 2010 and 2012. In 2010 Jason Martin of Tilman & Associates appraised the Subject Property at a fair market value of $6,712,840, finding the fair market value of a single-family residence located on the Subject Property to be $525,000 and the four parcels of land to be worth $4,000 per acre or $6,187,840 (Martin Appraisal). In ascertaining the fair market value of the Subject Property, Mr. Martin used the comparable sales approach and concluded its highest and best use to be "hunting land and recreation property" on the basis of its then-existing use.

San Diego Private Bank, which held the mortgage on the Subject Property, commissioned Integra Resources to perform a desktop review of the Martin Appraisal (Greenwald Review), which was conducted by Jeff Greenwald. The purpose of Mr. Greenwald's review was to verify the Martin Appraisal's "compliance with accepted professional standards and reporting guidelines of San Diego Private Bank, and the Uniform Standards of Professional Appraisal Practices (USPAP) of the Appraisal Foundation." Mr. Greenwald concluded that the Martin Appraisal is not complete and accurate pursuant to the standards set forth in USPAP and that the "analyses, opinions and conclusions . . . are not appropriately developed and are not judged to be reasonably supported." Mr. Greenwald noted that on the basis of a series of errors and lack of reasonable support, he could not agree with the value conclusions reached in the Martin Appraisal.[6] Mr. Greenwald did not

---

[5] Timbervest, a timber management organization, considered purchasing the Subject Property, but determined that the value of the timber was less than $6 million.

[6] On February 29, 2012, Mrs. Smoltz forwarded Mr. Dodd a copy of the Greenwald Review. Mr. and Mrs. Smoltz engaged Mr. Dodd to conduct due diligence on the value of the Subject Property. As part of his due diligence Mr. Dodd requested that Bernie Butler evaluate the Subject Property to best determine how to sell it. Mr. Butler is a real estate developer and broker with 35 years of experience who

[*5] offer an opinion as to the fair market value of the Subject Property in his report.

By March 1, 2012, the mortgage on the Subject Property was held by Brand Bank, which commissioned an appraisal of the Subject Property to be performed by Cushman & Wakefield. Scott Tonnenson prepared the Brand Bank Appraisal and concluded that the fair market value of the Subject Property was $4,020,000, not accounting for the contributory value of the timber. The Brand Bank Appraisal employed the cost approach to value the residence and improvements on the Subject Property at $908,881 and used the sales comparison approach to determine the fair market value of the vacant land as $3,110,000. Moreover, the Brand Bank Appraisal determined the highest and best use of the Subject Property to be "continued agricultural and recreational use."

James Davis of Valuation Management Group, LLC, performed a technical review of the Brand Bank Appraisal to confirm its compliance with USPAP; however, his report did not give an opinion as to the value of the Subject Property. Mr. Davis's technical review of the Brand Bank Appraisal concluded that it was credible and in compliance with USPAP.

II.   *Conservation Easement Transaction*

Mr. Adams[7] has spent his career in the real estate industry and has worked for several companies in various roles in the development of hotels, office buildings, apartments, planned communities, public-private ventures, golf courses, and other recreational activities. The real estate firms Mr. Adams worked for include Major, Inc., Chatham Hill, LLC, and Broad Street Partners, LLC. Mr. Adams also played a role in redeveloping the Barnsley Gardens Resort in the late 1990s, which is currently a luxury resort located in Adairsville, Georgia.

Mr. Adams became aware that the Subject Property might be for sale in 2012 through Carlton Walstad, who, at the time, was an

concluded that on the basis of his experience, the Subject Property was worth $3 million. Mr. Butler communicated his opinion regarding the value of the Subject Property to Mr. Dodd.

[7] Mr. Adams is an attorney licensed to practice in Georgia and before this Court, and he has also represented clients before the Internal Revenue Service (IRS). Additionally, Mr. Adams was the managing and sole member of Awahili Alliance, LLC, which, during the relevant periods, provided consulting services regarding conservation easement transactions. Awahili Alliance, LLC, was treated as a disregarded entity for federal income tax purposes.

[*6] employee of Timbervest. Mr. Walstad was interested in partnering with Mr. Adams to invest in the Subject Property, either directly or indirectly. In early 2012 Mr. Adams and Mr. Walstad visited the Subject Property and met with Mr. Klesko. Despite the Subject Property's being listed for $9 million Mr. Adams presented a conservation easement plan to Mr. Klesko and Mr. Smoltz and discussed a $6 million purchase price. After the meeting Mr. Klesko instructed Mr. Haun to remove the Subject Property's listing since he was planning to go ahead with a conservation easement.

A.    *The Subject Property in 2012*

On May 17, 2012, Mr. Adams organized Big Knoll Farms, LLC (Big Knoll Farms), to potentially purchase the Subject Property. On the same day Mr. Adams organized BKF Management, LLC (BKF Management), to act as the managing member of Big Knoll Farms. BKF Management had four members—Mr. Adams, Mr. Walstad, Pete Powell, and Mr. Klesko—each holding a 25% interest in the LLC.

Mr. Adams drafted a Purchase and Sale Agreement (2012 P&S Agreement) that he sent to Mr. Klesko on behalf of Big Knoll Farms, which gave Big Knoll Farms the exclusive right to purchase the Subject Property for $6 million. Mr. Dodd advised the Smoltzes with regard to Mr. Adams's offer.

In fact, Mr. Adams often communicated directly with Mr. Dodd regarding matters related to Big K Farms and the Subject Property. In a June 19, 2012, email to Mrs. Smoltz, Mr. Dodd notes his belief that the Subject Property is likely worth about $3 million but that Mr. Adams is willing to extend the $6 million offer because of the "value of the potential tax deductions and tax credits." Mr. Dodd informed Mrs. Smoltz that he thought it would be unlikely for someone to offer more than $3 million if they waited longer to sell the Subject Property, advising her that Mr. Adams's offer seemed to be a "good bet." On February 26, 2012, Mr. Klesko signed the 2012 P&S Agreement. Mr. Adams, on behalf of Big Knoll Farms, and Mrs. Smoltz added their signatures to the 2012 P&S Agreement on June 26, 2012.

The 2012 P&S Agreement contained a provision giving Big Knoll Farms 180 days to inspect the Subject Property and to determine whether it wanted to move forward with the purchase. The 2012 P&S Agreement also contained a "Break Fee" provision giving Big Knoll Farms the right to collect $1 million should Big K Farms seek to default

[*7] on its obligation to sell the Subject Property under the terms of the agreement once signed. Additionally, the 2012 P&S Agreement included "Special Stipulations" that provided that "as an alternative to Purchasing the [Subject] Property" Big Knoll Farms "shall have the right to purchase up to all but not less than 98% of the membership interest in [Big K Farms] based upon the stated purchase price . . . of $6,000,000."

### 1.  *Land Plan*

Mr. Adams drafted a land plan for the development of a proposed upscale residential community on the Subject Property. The land plan had a design for 307 total residential lots surrounding a lake in the center of the Subject Property, consisting of 200 village lots, 96 environmental lots, and 11 estate lots. The draft land plan also included equestrian grounds, a shooting station for sporting clays, an inn, a post office, and a fitness center on the Subject Property.

In September 2012 Mr. Adams engaged Spencer Tunnell of Tunnell & Tunnell, a landscape architect firm in Atlanta, Georgia. Mr. Adams provided Mr. Tunnell with his draft land plan along with a topographical map of the Subject Property. After reviewing the draft land plan, Mr. Tunnell prepared a schematic land plan (2012 Land Plan), validating the draft land plan in terms of spacing and physical fit of the lots on the Subject Property. The 2012 Land Plan, entitled "Big Knoll Farms Land Plan," is conceptual since it does not take into account county zoning requirements, water availability, county or state sewage requirements, septic rules, any cost prohibitions, or utilities associated with the proposed residential community development.

### 2.  *2012 Appraisal of the Subject Property*

In 2012 Mr. Adams engaged the services of an appraiser, Jim Clower, to ascertain the fair market value of the Subject Property "before" and "after" the granting of the conservation easement.[8] Mr. Clower issued an appraisal report with an effective date of December 7, 2012, that determined the value of the Subject Property

---

[8] Petitioner posits that Mr. Adams provided Mr. Clower a "conceptual pro forma" and "Highest and Best Use, Market & Feasibility Study" prepared by Mark Reavis for the proposed residential community development. However, these documents are dated June 1, 2013, and April 30, 2013, respectively. Accordingly, the "conceptual pro forma" and "Highest and Best Use, Market & Feasibility Study" will be addressed *infra* Part II.B.3 and 4 of our Findings of Fact.

[*8] "before" the granting of the conservation easement to be $59,958,570, and the value of the Subject Property "after" the granting of the conservation easement to be $4,129,886.[9]

### 3. *Aprio, LLP*[10]

In August 2012 Mr. Adams met with Robert Greenberger, a certified public accountant (CPA) and partner in the professional service group at Aprio, LLP (Aprio), to discuss a conservation easement project on the Subject Property. Mr. Greenberger has extensive experience in real estate, captive insurance companies, family limited partnerships, trusts, subchapter S corporations, and estate planning, as well as presenting on the topic of conservation easements. Aprio maintained a list of ongoing potential conservation easement investments so that they could inform interested clients whether a potential conservation easement investment was full or potentially not going to fill up.

### 4. *2012 Subject Property Investment*

On November 15, 2012, Big Knoll Farms released an offering summary for potential investment in the Subject Property, which included the possibility of encumbering the Subject Property with a conservation easement. However, the 2012 P&S Agreement between the Partnership and Big Knoll Farms failed to close because an insufficient number of investors were located to meet the targeted minimum subscription requirement. Nearing the end of December 2012 Mr. Adams discussed the possibility of extending the 2012 P&S Agreement for another year with Mr. Klesko, the Smoltzes, and Mr. Dodd.

On January 2, 2013, Mr. Adams sent Mr. Dodd an addendum to the 2012 P&S Agreement, which proposed extending the agreement through 2013 at the same $6 million purchase price and explained that the "sole purpose of the addendum is to extend the closing date until just after the first of next year in order to allow us to go back to work on putting the deal together." On January 29, 2013, Mr. Dodd advised the Smoltzes to again accept the $6 million offer and enter into an agreement with Mr. Adams since it "doubles the value" of the Subject

---

[9] Mr. Clower prepared an additional appraisal in 2013 which came to the same value conclusions as his 2012 appraisal report.

[10] Formerly known as Habif Arrogeti & Wynne and "HAW."

[*9] Property, especially in the light of his estimation that "no one is beating down [their] door to buy [it]."

B.    *The Subject Property in 2013*

On February 18, 2013, Mr. Adams organized Big K to again attempt to lock down the purchase of the Subject Property. The original members of Big K were Mr. Adams, Mr. Klesko, and Big K Management, LLC (Big K Management), holding 50%, 48%, and 2% interests in the LLC, respectively. Big K Management was organized on February 18, 2013, to act as the managing member of Big K. Big K Management's initial members were Mr. Adams, Mr. Klesko, and Evrgreen Management Group, Inc. (Evrgreen Management), holding 51%, 44%, and 5% interests in the LLC, respectively (collectively, Managers).

Pursuant to a Purchase and Sale Agreement (2013 P&S Agreement), executed on February 18, 2013, Big K Farms agreed to sell the Subject Property to Big K. The 2013 P&S Agreement, except for the names of the newly formed LLCs, is virtually identical to the 2012 P&S Agreement. The 2013 P&S Agreement similarly provided for the acquisition of the Subject Property for $6 million, contained provisions for an inspection period and a "Break Fee," and gave Big K the alternative option to purchase "up to but not less than 98% of the membership interest in [Big K Farms]."

1.    *Land Plan*

Sometime early in 2013 Mr. Adams communicated with Mr. Tunnell to change the name on the 2012 Land Plan he had prepared for Big Knoll Farms. In an email to Mr. Tunnell dated March 11, 2013, Mr. Adams sent Mr. Tunnell his appreciation for allowing him to change the name on the land plan from "Big Knoll Farms" to "Big K Farms" (2013 Land Plan). Except for the name change, the land plan for the proposed upscale residential development remained unchanged from 2012.

2.    *Jones County Zoning*

The proposed upscale residential development would not have been permitted on the Subject Property under the existing zoning regulations without first securing a variance.

Tim Pitrowski has been the Jones County Zoning director since 1996 and is responsible for monitoring compliance with zoning

[*10] requirements and issuing permits for development. In order to construct a new subdivision in Jones County, a developer would need to meet with Mr. Pitrowski, who would determine whether the conceptual plan complied with zoning regulations. Mr. Pitrowski would also consider lot sizes, density, topography concerns, and utilities to determine whether a plan was feasible for a given area.

If a proposed development plan did not comply with existing zoning regulations, the developer would need to apply for a variance. On June 25, 2013, Mr. Klesko and Mr. Adams met with Mr. Pitrowski to discuss the 2013 Land Plan for the proposed development on the Subject Property. After the meeting, Mr. Pitrowski emailed William Noland, a Jones County attorney, outlining the conversation he had with Mr. Adams and Mr. Klesko and attached the documents provided to him, including the 2013 Land Plan and a draft letter regarding a zoning variance on the Subject Property. Mr. Pitrowski and Mr. Noland edited the draft letter slightly, and on June 25, 2013, Mr. Pitrowski issued an opinion letter from the Jones County Planning and Zoning Department to Mr. Adams and Mr. Klesko stating that it is his "opinion that it is 'more likely than not' that if the [2013 Land Plan] . . . were submitted to this jurisdiction for a formal approval, given the current rules and regulations as we currently understand and interpret them, the land use/subdivision plan would be approved."

### 3. *Conceptual Pro Forma*

In addition to developing the 2013 Land Plan, Mr. Adams created a conceptual pro forma for the proposed upscale residential development wherein he stated his opinion that the village lots could be sold for $64,688,000, that the environmental lots could be sold for $30,508,000, and that the estate lots could be sold for $4,136,000. The conceptual pro forma also reflected Mr. Adams's estimate that it would cost $4,750,000 to develop the fitness center, sporting clays, equestrian facility, and community garden, as well as his estimate of development, sales, and marketing expenses of 12%.

### 4. *Highest and Best Use, Market and Feasibility Study*

During 2013 Mark Reavis was the shareholder and president of Coastal Capital Advisors, Inc. On April 9, 2013, Mr. Adams provided Mr. Reavis with a document that he drafted titled "Draft Highest and Best Use/Market & Feasibility Study." Mr. Reavis relied on portions of Mr. Adams's draft document in preparing his "Highest and Best Use,

[*11] Market & Feasibility Study" (HBU Study) dated April 30, 2013, in which he states that the Subject Property's highest and best use is the "proposed development of the Property as a residential cluster or village community with a hospitality component as shown in the . . . [2013 Land Plan]." The HBU Study is substantially similar to the draft provided by Mr. Adams. Mr. Reavis assumed that all the information and data in the draft were correct and concluded that proposed development of the Subject Property had a net present value of $77,874,000, assuming a 10-year exposure period (i.e., the time it would take to sell the lots).

### C.  *2013 Appraisal of the Subject Property*

In 2013 Mr. Adams engaged Dale Hayter, Jr., to provide appraisals of the conservation easement contemplated on the Subject Property. Mr. Hayter is the owner of Independent Appraisals, LLC, and regularly performed real estate appraisals. Mr. Hayter had more than 20 years of experience as a licensed appraiser in the State of Georgia when he performed his appraisal. He is a member of the Appraisal Institute, holds its MAI designation, and performed approximately 15 to 20 conservation easement appraisals in or before 2013 and roughly 70 after 2013, a significant portion of which were syndicated conservation easement transactions.

Mr. Hayter performed two appraisals of the Subject Property for the purpose of determining the fair market value of the conservation easement with effective dates of April 5 and November 5, 2013.[11] Before Mr. Hayter performed his appraisal of the conservation easement, Mr. Adams provided him with Mr. Clower's 2012 appraisal report and the HBU Study prepared by Mr. Reavis, as well as information and data concerning potentially comparable developments. Mr. Hayter's appraisal notes that six parcels of land on the Subject Property totaling approximately 10.54 acres are excluded from the area over which the conservation easement is to be granted. The excluded parcels include the existing single-family residence that overlooks the lake on the Subject Property and various other small structures.

---

[11] Since the November 5, 2013, appraisal was attached to the Partnership's Form 1065, U.S. Return of Partnership Income, and offered as petitioner's expert report regarding the valuation of the conservation easement, we will not address the April 2013 appraisal. Accordingly, all references to Mr. Hayter's 2013 appraisal are to the appraisal with the November 5, 2013, effective date.

**[\*12]**        1.        *The Subject Property's Highest and Best Use*

Mr. Hayter valued the conservation easement using the income method.[12] Mr. Hayter concluded that the highest and best use of the Subject Property before the granting of the conservation easement was the "development of a 307 lot hunting and conservation oriented residential community." He reached this conclusion by examining whether this use was (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive.

Mr. Hayter noted that under the current zoning—rural residential—the proposed development would not be allowed. However, he concluded that the proposed development would be a legally permissible use of the property "based on conversations with the County Planning and Zoning Director" that it was very likely that the Subject Property could receive re-zoning and development approval.

Mr. Hayter also concluded that the proposed development is physically possible because of the Subject Property's suitability for development, which includes the availability of utilities and access to public water and community septic. However, Mr. Hayter did not provide any information on the suitability of community septic for the proposed development.

In concluding that the proposed development would be financially feasible, Mr. Hayter relied on several factors. He noted that the proposed development would be well received by the market, on the basis of his survey of other communities with similar features. Mr. Hayter further highlighted that development funds are available, financially sound home purchasers are able to obtain mortgages, and national home builders are acquiring large undeveloped land parcels for near-term subdivision development. Mr. Hayter further noted that "[r]esidential development pressure is moving north toward the [S]ubject [P]roperty."

Lastly, Mr. Hayter concluded that the proposed development would be the most productive use of the Subject Property on the basis of

---

[12] The discounted cashflow method of valuation, which is a subpart of the income method, values a property by discounting expected cashflow from the property. *See, e.g.*, *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision). A given property's value is determined under this method by adding the sum of the present values of the expected cashflows from the property to the present value of the residual value of the property. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 327 (2013); *see also Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*64.

[*13] his assertion that there would be substantial entrepreneurial profit available and that "no known alternative use . . . would generate a higher present value."

With respect to his valuation conclusion Mr. Hayter used the subdivision method, which is a subpart of the income method, and he performed a discounted cashflow analysis to determine the "before" value of the Subject Property, which included estimating the lot prices, development costs, cost of sales, and other relevant items. Mr. Hayter analyzed the 307 lots in the proposed development and categorized them according to the 2013 Land Plan as village lots (46 lake front and 154 interior), environmental lots (44 water front and 52 woods views), and estate lots. In order to develop estimates for the likely lot values, Mr. Hayter selected five comparable properties: (1) Palmetto Bluff in Bluffton, South Carolina, (2) Brays Island Plantation in Sheldon, South Carolina, (3) Ford Plantation in Richmond Hill, Georgia, (4) Reynold's Plantation in Greensboro, Georgia, and (5) Serenbe in Chattahoochee Hills, Georgia.

2.   *Value of the Subject Property Before Granting of Conservation Easement*

In his appraisal Mr. Hayter determined that the Subject Property had a fair market value of $50,480,000 "before" the granting of the conservation easement. Mr. Hayter analyzed sales data from his selected comparable developments and performed a discounted cashflow analysis. He made qualitative adjustments on the basis of the comparable developments' being (1) significantly inferior, (2) inferior, (3) superior, or (4) significantly superior to the proposed development.

a.   *Subject Property Village Lots*

Mr. Hayter estimated the average value of the village lots to be $325,000 and $450,000 for the interior and lake front lots, respectively. Mr. Hayter's two comparable developments for village lots were Palmetto Bluff and Serenbe.

According to Mr. Hayter, Palmetto Bluff, which had village lot sales ranging from $500,000 to $1 million, was significantly superior to the subject lots because of the extensive amenities, coastal influence, and larger body of water frontage. Thus, he made downward adjustments and determined that the lake front village lots would sell in the $350,000 to $550,000 range. Mr. Hayter considered Serenbe, which had village lot sales ranging from $50,000 to $100,000, to be

[*14] significantly inferior because of the limited amenities, distance from shopping and entertainment, and the much lower home price range. Therefore, he made upward adjustments and determined that the interior village lots would sell in the $300,000 to $350,000 range.

b.    *Subject Property Environmental Lots*

Mr. Hayter divided the 96 proposed environmental lots into two categories, south of lake and north of lake, which would be either stream and water front lots or wooded lots. Mr. Hayter estimated that the average value of the wooded, and the stream and water front, lots to be $250,000 and $350,000, respectively. Mr. Hayter selected Palmetto Bluff, Brays Island Plantation, and Serenbe to be the most appropriate comparable developments for estimating the value of the stream and water front environmental lots.

River front lots at Palmetto Bluff sold in the range of $400,000 to $1,100,000, and marsh front lots sold in the range of $210,000 to $825,000. However, Mr. Hayter found that the river front and marsh front lots were superior to the subject lots because of their location on a much larger body of water. Therefore, Mr. Hayter made downward adjustments, indicating that the stream and water front lots would sell in the $300,000 to $350,000 range when compared to the river front lots at Palmetto Bluff. Mr. Hayter also analyzed the pond front lots at Palmetto Bluff, which sold in the range of $125,000 to $350,000, but Mr. Hayter found them to be inferior to the subject lots because of the smaller pond. Accordingly, Mr. Hayter made upward adjustments indicating that the stream and water front lots would sell in the $300,000 to $450,000 range when compared to the pond front lots at Palmetto Bluff. According to Mr. Hayter, the aforementioned analysis indicated to him that the stream and water front lots on the Subject Property would sell for $350,000 when compared to Palmetto Bluff.

Marsh front lots in Brays Island Plantation sold in the range of $400,000 to $750,000, but Mr. Hayter determined Brays Island Plantation was superior to the proposed development because of its coastal influence and amenities, in addition to the marsh lots' being on larger bodies of water and having more extensive views. Therefore, Mr. Hayter made downward adjustments and estimated that the stream and water front lots on the Subject Property would sell in the $300,000 to $350,000 range when compared to Brays Island Plantation.

[*15] Lastly, Mr. Hayter analyzed water front pond lots at Serenbe, which sold in the range of $125,000 to $240,000. Mr. Hayter found the water front pond lots at Serenbe to be significantly inferior because of the limited amenities, distance from shopping and entertainment, and small size of the pond. Therefore, Mr. Hayter made upward adjustments and estimated that the water and river front lots on the Subject Property would sell in the $300,000 to $400,000 range when compared to Serenbe.

On the basis of the three analyzed properties with lots similar to the stream and water front lots on the Subject Property, Mr. Hayter determined that stream and water front lots would sell anywhere from $300,000 to $400,000, concluding the appropriate value to be $350,000.

Mr. Hayter also selected Palmetto Bluff, Brays Island Plantation, and Serenbe to be the most appropriate comparable developments for estimating the value of the wooded environmental lots. Wooded lots at Palmetto Bluff sold in the range of $50,000 to $395,000 for inferior and superior lots, respectively. Mr. Hayter found some lots to be inferior to the subject lots because of their poor shape or distance from nearby amenities. And he found some lots to be superior because of their size and proximity to amenities. Accordingly, Mr. Hayter made upward and downward adjustments and estimated that the wooded lots on the Subject Property would sell in the $200,000 to $300,000 range when compared to Palmetto Bluff.

Wooded lots at Brays Island Plantation sold in the range of $63,000 to $500,000 for inferior and superior lots, respectively. Mr. Hayter found some of the lots to be inferior to the subject lots because of their irregular shape and distance from amenities. As for the superior lots, Mr. Hayter found that they were larger and closer to amenities and had better views. Mr. Hayter made upward and downward adjustments and estimated that the wooded lots on the Subject Property would sell at $250,000 when compared to Brays Island Plantation.

Wooded lots at Serenbe sold in the range of $67,500 to $390,000, but Mr. Hayter found them to be inferior to the subject lots because they were generally smaller. Accordingly, Mr. Hayter made slight upward adjustments and estimated that the wooded lots on the Subject Property would sell in the $225,000 to $275,000 range when compared to Serenbe.

On the basis of the three analyzed properties with lots similar to the wooded lots on the Subject Property, Mr. Hayter determined that

[*16] the wooded lots would sell anywhere from $200,000 to $300,000, concluding the appropriate value to be $250,000.

c. *Subject Property Estate Lots*

The proposed development would have 11 estate lots ranging from 5 to 10 acres. Mr. Hayter selected Palmetto Bluff and the Ford Plantation to be the most appropriate comparable developments for estimating the value of the estate lots.

Estate lots at Palmetto Bluff, which were between 5 and 10 acres, sold in the range of $600,000 to $650,000, averaging between $65,000 and $120,000 per acre. Mr. Hayter found the estate lots at Palmetto Bluff to be superior to the subject lots because of the coastal influence and greater amenities. Accordingly, Mr. Hayter made downward adjustments and estimated that the estate lots on the Subject Property would sell in the $70,000 to $80,000 per acre range when compared to Palmetto Bluff.

Estate lots at the Ford Plantation, which were smaller at 3 to 8 acres, sold in the $150,000 to $550,000 range, averaging between $68,750 and $95,000 per acre. Mr. Hayter likewise found the estate lots in the Ford Plantation to be superior to the subject lots because of the coastal influence and greater amenities. Therefore, Mr. Hayter made downward adjustments and estimated that the estate lots on the Subject Property would sell in the $50,000 to $75,000 range when compared to the Ford Plantation.

On the basis of the two analyzed properties with lots similar to the estate lots on the Subject Property, Mr. Hayter determined that the 5-acre estate lots would sell anywhere from $250,000 to $400,000, and that the 10-acre estate lots would sell anywhere between $500,000 and $800,000.

d. *Discounted Cashflow Analysis*

For his "before" valuation of $50,480,000, Mr. Hayter performed a discounted cashflow analysis, which uses projections over a particular period. Mr. Hayter estimated an absorption period of 10 years, anticipating that more sales will occur in the early to middle years than in the later years. Mr. Hayter also estimated an average annual lot price and expense increase of 2.25% and 2.50%, respectively. Mr. Hayter also estimated the average annual expense increase, marketing and selling costs, closing costs, promotional and advertising expenses, management

**[*17]** and administration expenses, legal and professional fees, real estate taxes, holding and maintenance expenses, homeowner association dues for unsold lots, infrastructure construction costs, and amenity construction costs.

Mr. Hayter's total estimated construction cost for the proposed development is $12,057,500, and he determined a developer's profit to be 9% of the gross revenue from real estate sales or about $10 million. Mr. Hayter determined a 10% discount rate to be appropriate on the basis of his observance of discount rates for properties similar to the Subject Property.

3.  *Value of the Subject Property After Granting of Conservation Easement*

In determining the "after" value of the Subject Property, Mr. Hayter noted that the potential uses of the Subject Property will be substantially limited once the conservation easement is granted since neither traditional development activities or uses can occur nor are industrial, commercial, or residential uses allowed. However, timber and habitat management are still allowed as are hunting and horseback riding. Limited additional structures can be added when related to hunting, equestrian uses, wildlife observation, etc. New jeep trails will be allowed in certain areas.

Mr. Hayter used the comparable sales method to determine the "after" value of the Subject Property, researching and analyzing the sales of similar land parcels with similar conservation easements and/or restrictions. Mr. Hayter estimated the amount of any enhancement the conservation easement could have on the excluded parcels.

Mr. Hayter identified four properties he deemed comparable to the Subject Property that yielded sale prices of $596 to $2,043 per acre.[13] He highlighted the fact that all the sales occurred after the granting of a conservation easement and that all of the selected comparable properties, which are located in the northern portion of Georgia, would have development potential in the near to moderately near future. Mr. Hayter made an upward adjustment since he found the comparable properties to be inferior to the Subject Property as they were further

---

[13] The four comparable encumbered land parcels were located on Calhoun Highway in Elbert County, Georgia, Lavender Trail in Floyd County, Georgia, Wellington Mill Road in Carroll County, Georgia, and the west side of Yellow Creek Road in Cherokee County, Georgia.

**[\*18]** from metro Atlanta. Accordingly, Mr. Hayter determined the "after" value of the Subject Property to be $1,500 per acre or about $2,300,000. On the basis of the Jones County tax assessor tax values, Mr. Hayter concluded the contributory value of the excluded structures to be $380,000, which results in the Subject Property's having an "after" value of $2,680,000 once the conservation easement is granted on the Subject Property.

4. *Value Enhancement to Existing Structures*

Mr. Hayter noted that any value enhancement to the excluded structures because of the granting of the conservation easement would result from increased land values. Mr. Hayter estimated that the value of the excluded parcels that are on the interior of the Subject Property would not increase, but he does estimate that the value of the existing residence and other lake front sites would increase as they would be more desirable since they would be perpetually surrounded by undeveloped land. Accordingly, Mr. Hayter concluded the value enhancement to the existing structures to be $230,000, which is based on an analysis of similar lot sales in Serenbe.

5. *Estimated Deduction Amount*

Mr. Hayter estimated the amount of a potential deduction to be $47,570,000, which is the difference between the "before" value ($50,480,000) and the "after" value ($2,680,000), less the value of the enhancement ($230,000).

III. *Sale of Partnership Interests to Investors*

A. *Morris Manning & Martin LLP*

On April 8, 2013, Big K Management retained Timothy Pollock of Morris Manning & Martin, LLP (Morris Manning & Martin), to provide advice in connection with the sale of membership interests in Big K and the acquisition of a controlling interest in the Partnership. Specifically, Morris Manning & Martin was to assist Big K and Big K Farms in designing and drafting operating agreements and to work with the respective entities in preparing a subscription agreement for the sale of membership interests in Big K and the related documents as well as supervising the sale transaction.

Morris Manning & Martin was to review the deed of conservation easement for Big K Farms should it choose to move forward with a

[*19] conservation easement donation. While Morris Manning & Martin did review Mr. Hayter's 2013 appraisal, it was not engaged to review and did not review the appraisal for Big K to determine whether the value was correct, whether the highest and best use was correct, or whether it complied with USPAP. Morris Manning & Martin never provided a tax opinion in connection with the conservation easement transaction.

### B. *Matt Campbell of Evrgreen Management*

In August or September 2013 Big K Management retained Evrgreen Management to provide advisory services related to the Subject Property. During 2013 Matt Campbell was the president of Evrgreen Management and was experienced in syndicated conservation easement transactions, as he was involved in more than 50 from 2008 to 2015. Mr. Adams brought Mr. Campbell into the transaction as a managing member of Big K Management since he had a track record and reputation in the syndicated conservation easement community with potential investors and advisors who were often wary of investing in transactions with inexperienced sponsors. Mr. Campbell was to find sufficient investors to close the Big K offering in 2013.

### C. *Private Placement Memorandum*

Big K issued an investor package, including a private placement memorandum (PPM) to potential investors. The PPM outlined the following steps regarding the transaction. Big K intended to raise up to $9,800,000 in investments, selling 49 units at $200,000 each. Big K budgeted $273,500 to reimburse Mr. Adams and Mr. Klesko for prior services, valuations, and related expenses. Big K was to pay $6 million to acquire 99% of the Partnership. $250,000 was set aside for legal expenses. The PPM outlined three possible uses for the Subject Property after acquisition by Big K: (1) development, (2) investment, and (3) conservation.

The development proposal is consistent with the proposed development, and the PPM notes that "[t]he property lends itself well to an upscale conservation oriented 'sporting club' development and has market analysis and valuation support for this use."

The investment proposal was to acquire the Subject Property, manage the timber pursuant to the timber management plan, and strive for an overall return of around 8% annually, which would be accomplished through both appreciation of the raw land due to its

[*20] proximity to Macon, Georgia, and the profits from growing and harvesting the timber.

The conservation proposal involves the use of a deed restriction to perpetually restrict the development of all or portions of the Subject Property. This restriction would extinguish certain development rights in perpetuity and restrict future use to agricultural endeavors or passive recreation pursuant to the terms of a recorded and legally binding conservation easement deed.[14]

The PPM stated that Mr. Adams would consider each strategy and make a selection as to Big K's course of action with regard to one of them. The PPM also noted that consent to the selection of the development proposal or the investment proposal requires unanimous agreement of the Big K members. Moreover, if the manager selected the development proposal or the investment proposal and was unable to obtain unanimous consent of the other members, the conservation proposal was deemed selected.

D.     *Big K Investors and Payments*

Larry King has been working as a CPA since 1971 and started his own firm, L.S. King & Associates, P.C. During 2012 and 2013 Mr. King was a board member of the Ellijay Telephone Co., and three shareholders (Douglass Harrison, John Harrison, and Marianne Bowman, collectively Ellijay Shareholders) were members of that same board. Part of his duties as a CPA and board member was to investigate ways to save on taxes for the Ellijay Shareholders.

Mr. King became aware of Mr. Adams's 2012 conservation easement plan for the Subject Property and forwarded it to Al Threlkeld, a CPA who also worked with the Ellijay Shareholders, asking him to review it as it would "save tax[es] for the shareholders." Mr. Threlkeld has been a CPA at Haynes & Moore in Rome, Georgia, for the past 40 years. Through Mr. King, Mr. Adams was put in contact with Mr. Threlkeld. Before December 12, 2013, the Partnership entered into an agreement with Haynes & Moore under which Big K would pay an 8% commission on the $1 million the Ellijay Shareholders agreed to

---

[14] The value of the conservation easement is based on Mr. Hayter's appraisal with the Subject Property's highest and best use being Mr. Adams's envisioned upscale residential community development. The expected tax ratio under the conservation strategy was 1 to 4.39, under which a $200,000 investment would return $878,000 in tax deductions and provide an estimated 200% return on investment.

**[\*21]** invest in the conservation easement transaction. However, in a December 13, 2013, letter to Haynes & Moore, Mr. Adams incorrectly indicated that the payment was for due diligence services in connection with the Big K PPM.

Christopher Graham is a former managing director of the Private Client Law Group (PCLG) and a former managing member of Emerald Acquisition 2013, LLC (Emerald 2013), which invested in the Partnership. Aaron Kowan is a former managing director of the PCLG and the current managing member of Emerald 2013. CPAs would often contact the PCLG in search of conservation easement transactions for clients looking for tax deductions. As a result, Mr. Kowan decided to set up annual aggregation vehicles known as Emerald Acquisitions Funds (Emerald Funds) for clients to invest in conservation easement transactions that he selected. The Emerald Funds would typically invest in 8 to 15 different conservation easement transactions a year, and Mr. Kowan would negotiate with the easement sponsors for a percentage rebate of the fund's investment, normally between 3% and 6%.

Mr. Kowan maintained a contemporaneous spreadsheet for the Emerald 2013 conservation easement transactions that identified the easement, the sponsor, the amount invested, the return ratio, the expected deduction, the discount, and the discount percentage that were negotiated with each sponsor. Emerald 2013's spreadsheet reflects Big K as the investor, Mr. Adams as the sponsor, $800,000 as the amount invested, 5% as the discount rate, $40,000 as the discount, 4.57 as the return ratio, and $3,656,000 as the expected deduction.

In a December 13, 2013, letter to the PCLG, Mr. Adams remitted a $45,000 check purporting to be payment for due diligence and legal services in connection with the Big K PPM. While the PCLG did provide comfort letters to two investors in the Big K easement transaction for a total of $5,000, it did not review the transaction for its compliance with the Code as the PCLG was not engaged to conduct due diligence for the Partnership.

Additional individuals invested in the conservation easement transaction, and all 49 units of Big K were subscribed by the beginning of December 2013, meaning the project was filled. On December 12, 2013, with the subscription filled, Big K purchased 99% of the membership interests in Big K Farms, with Mr. Klesko retaining a 1% interest.

**[*22]** E. *Big K Member Vote*

In early December 2013, and per the advice of Mr. Pollock, Big K members were provided with an investor voting form on which they could either approve or disapprove the conservation proposal. Although the member vote was not binding on Mr. Adams, nor could it change the terms of the PPM, all investing members in Big K unanimously voted in favor of the conservation proposal.

IV. *Grant of Easement*

On December 26, 2013, consistent with the vote of the Big K members, the Partnership filed the Conservation Easement and Declaration of Restrictions and Covenants (conservation easement deed) with the Jones County Clerk of Court. The conservation easement deed was dated December 20, 2023, and purports to show that Big K Farms voluntarily granted to SERLC[15] a conservation easement over approximately 1,545.79 acres on the Subject Property in perpetuity to protect the conservation values, which refer to natural open space and scenic and educational values.

The conservation easement deed identifies five conservation purposes: (1) water quality protection, (2) natural habitat protection, (3) open space protection, (4) scenic enjoyment of the general public, and (5) public conservation education. The conservation easement deed also imposes several restrictions on Big K Farms and provides SERLC enforcement rights and remedies. Moreover, the conservation easement deed contemplates the possibility that the conservation easement could be extinguished by judicial proceedings, and states in part:

> For purposes of this Conservation Easement, the fair market value of SERLC's right and interest (which value shall remain constant) shall be equal to the difference between (a) the fair market value of the Conservation Area as if not burdened by this Conservation Easement and (b) the fair market value of the Conservation Area burdened by this Conservation Easement, as such values are determined as of the date of this Conservation Easement. If a change in conditions makes impossible or impractical any continued protection of the Conservation Area for conservation purposes, the restrictions contained

---

[15] A tax-exempt organization as described under section 501(c)(3).

**[*23]** herein may only be extinguished by judicial proceeding. Upon such proceeding, SERLC, upon a subsequent sale, exchange or involuntary conversion of the Conservation Area, shall be entitled to a portion of the proceeds at least equal to the fair market value of the Conservation Easement as provided above. SERLC shall use its share of the proceeds in a manner consistent with the conservation purposes set forth in the Recitals herein.[16]

Therefore, the conservation easement deed entitled SERLC to a fixed amount, rather than a proportionate share of proceeds in the case of judicial extinguishment.

V. *Partnership Return*

The Partnership timely filed its 2013 Form 1065, which was prepared by Sam Tuck, CPA, of Aprio and signed by Mr. Adams on behalf of the Partnership. On Form 1065 the Partnership reported a charitable contribution deduction of $47,605,000. Attached to the Partnership's Form 1065 were Form 8283, Noncash Charitable Contributions; a supplemental letter; and Mr. Hayter's 2013 appraisal. Form 8283, which was signed by Mr. Hayter and clearly identified the Subject Property on line 5A as "Cons[ervation] easement under IRC 170(h) on land in Macon, Georgia." Moreover, Form 8283 reported the Partnership's adjusted basis in the Subject Property of $3,521,827 and amount claimed as a deduction of $47,570,000.

On the supplemental letter attached to Form 8283, the Partnership stated that the

> before value of the Conservation Area was $50,480,000 and the after value was $2,680,000. After subtracting the "after value" from the "before value", a $47,800,000 figure was reached and from that number was subtracted the enhanced value to the 6 parcels totaling 10.54 acre[s] of $230,000. This produced a net conservation easement valuation of $47,570,000.

---

[16] In our Order dated November 22, 2021, we note that the parties to the original conservation easement deed recorded a correction on June 12, 2020, which entitled SERLC "to a portion of the proceeds at least equal to that proportionate value of the Conservation Easement" upon judicial extinguishment.

**[\*24]** Form 8283, the supplemental letter attached thereto, and Mr. Hayter's 2013 appraisal all explicitly disclosed the conservation easement transaction to respondent and notified him of the relatively low adjusted basis in the Subject Property and the substantially higher claimed value of the conservation easement deduction.[17]

On March 30, 2017, respondent issued petitioner an FPAA asserting that the Partnership was not entitled to deduct the $47,605,000 charitable contribution on the basis that "[i]t has not been established that all the requirements of I.R.C. § 170 and the corresponding Treasury Regulations have been satisfied for the claimed noncash charitable contribution." Respondent also determined that an accuracy-related penalty was appropriate with respect to the claimed charitable contribution deduction, asserting a 40% penalty under section 6662(a) and (h) for gross valuation misstatements and, in the alternative, a 20% penalty under section 6662(a) and (b)(1), (2), and (3) for negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement.

In his First Amendment to Answer, dated February 10, 2021, respondent asserted that a civil fraud penalty under section 6663(a) applies.

VI.    *Expert Testimony*

    A.    *Petitioner's Experts*

        1.    *Dale Hayter, Jr.*

Petitioner presented Mr. Hayter as its valuation expert, and we recognized him as a percipient expert witness in our Order dated November 7, 2022. Mr. Hayter's expert report is his 2013 appraisal of the Subject Property, which is fully discussed *supra* Part II.C.

        2.    *Belinda Sward*

Petitioner presented Belinda Sward as an expert in the field of real estate marketing, and she was so recognized by the Court. Ms. Sward was engaged to perform a retrospective market analysis of

---

[17] However, Form 8283 identifies the value of the donated conservation easement as $47,570,000, which is $35,000 less than the $47,605,000 charitable contribution deduction reported on the Partnership's Form 1065. Petitioner has offered no evidence at trial or made any argument on brief regarding this $35,000 unidentified charitable contribution. Therefore, we find that petitioner has conceded this issue.

**[\*25]** Mr. Adams's proposed development on the Subject Property. Ms. Sward's report concluded that the Subject Property "has the characteristics, developer experience and location proximate to Metro Atlanta to be successfully developed for a sportsman resort/sporting community or some variation."

Ms. Sward's report relied extensively on data and information from 2014 or later in an effort to support her conclusions about the real estate market in 2013. All post-2013 data and information are irrelevant since none of the data and information were knowable or foreseeable by any market participant at that time. To the extent Ms. Sward's conclusion about the Subject Property is still supported by data and information in her report from 2013 or before, this Court is not in a position to make that determination.

Accordingly, Ms. Sward's retrospective market analysis does not assist the Court in making its findings regarding the feasibility of the proposed development since it relies too much on the benefit of hindsight.

B. *Respondent's Experts*

1. *Zac Ryan*

Respondent offered Zac Ryan as his valuation expert and to rebut Mr. Hayter's expert report. Mr. Ryan is a member of the Appraisal Institute, holds its MAI designation, and is a licensed appraiser in Georgia, Florida, and South Carolina. Since the 1980s Mr. Ryan has specialized in appraising large acreage, timberland, and environmentally sensitive parcels of land, and we recognized him as an expert in the fields of real estate valuation and appraisal review.

Mr. Ryan performed a retrospective fair market value appraisal of the conservation easement with an effective date of December 20, 2013. Mr. Ryan used the comparable sales method,[18] on the basis of a comparison to other land sales, in a "before" and "after" analysis, which

---

[18] Mr. Ryan argued that neither the cost nor the income approach to value was relied upon in the process of determining his estimate as to the value of the conservation easement. The cost approach was deemed inapplicable since the Subject Property existed as predominantly vacant land. Similarly, the income approach was not considered relevant because, in his estimation, neither the Subject Property's potential lease rate nor its subdivision potential would have determined or influenced the way in which the Subject Property was priced, marketed, or traded in the open market as of the effective date of his valuation report.

**[\*26]** involves appraising the Subject Property in the "before" situation as if it is not encumbered by the conservation easement, and then appraising the remainder parcel after the easement grant. The difference between the "before" and "after" values represents the value of the conservation easement concluded by Mr. Ryan.

### a. *Market Conditions*

In arriving at his valuation conclusions regarding the Subject Property, Mr. Ryan researched and included population, employment, and building permit trends for Jones County and the surrounding areas. Mr. Ryan analyzed information on sales activity for the local market as well as land use patterns in Jones County and other parts of Georgia, and he noted that Jones County was still suffering the consequences of the 2008 housing market crash. To that end, Mr. Ryan highlighted the fact that during 2013 new developments were not being created and older developments still had available inventory. Mr. Pitrowski confirmed that no new subdivision developments were issued building permits between 2013 and 2022 in Jones County.

Mr. Ryan noted that the average population, labor force, and income statistics in Jones County were all trending downward in the years leading up to the conservation easement transaction. Mr. Ryan also noted that almost 90% of the land in Jones County is dedicated to forest or agricultural use. Accordingly, Mr. Ryan determined that there was no indication that, in 2013, there would be a significant positive change in land use trends, development patterns, or population characteristics in the foreseeable future; rather, the "declines indicated there would be no demand for near-term development [of the Subject Property]."

Mr. Ryan also sought to identify the market area as the area where a prospective purchaser of a particular property would search for alternative acquisition opportunities, and he analyzed population data from 12 surrounding counties[19] (including Jones County). Given the Subject Property's overall size and desirable natural features, Mr. Ryan recognized that the area in which a prospective purchaser might search for alternative acquisition opportunities may very well cover the entire State of Georgia; however, he argues that "local area market influences have a bearing on prevailing prices and the overall value of the [Subject]

---

[19] The 12 counties were Pulaski, Houston, Peach, Crawford, Monroe, Jasper, Putnam, Jones, Bibb, Twiggs, Wilkinson, and Baldwin.

[*27] [P]roperty." Moreover, Mr. Ryan noted that between 2010 and 2013 Jones County, along with seven other nearby counties, was experiencing negative population growth, which he used to support his conclusion that the Subject Property was not ripe for development.

While not wholly similar with regard to the scale, elegance, and amenities of the proposed development envisioned by Mr. Adams, Mr. Ryan discovered declining market characteristics in various planned developments in Jones County, including Healy Plantation, River Cliffs, and Ryland Ridge. Most of these planned developments were brought to market around 2004 and resulted in roughly 50% of the available lots' being improved with finished houses and other lots' remaining undeveloped.

Mr. Ryan also analyzed lot sales activity of another Jones County subdivision known as Little Creek Community Preserve (Little Creek), which was a recreational and conservation community developed around the vision where likeminded market participants could own a lot and a home in a subdivision where they could collectively enjoy outdoor activities such as hunting, horseback riding, hiking, etc. Little Creek consists of 1,250 acres of common area, including 40 lots of approximately 5 acres each. Lots in Little Creek came available on the market in 2003, and Mr. Ryan noted that the lots originally sold in the $99,000 to $125,000 range, which in his estimation reflected the exuberance being experienced in the market at the time; however, by 2008 prices in the community were on a downward trend. The downward trend continued at least through 2013, when, between 2010 and 2013, four vacant lots in Little Creek were sold at significantly reduced per-acre prices by way of bank sales. Similar downward trends were likewise observed in the coastal Georgia region.

In the light of the foregoing, Mr. Ryan determined that the negative effects of the 2008 housing market crash were still being felt in Jones County and the surrounding areas in 2013 and that diminished prices and stifled demand dominated market trends. Mr. Ryan further determined that "buyers with near-term speculative investment goals were virtually nonexistent and sales activity was dominated by end users and/or investors who had intentions of holding properties for long periods of time."

**[*28]**                    b.    *Subject Property's Highest and Best Use*

Mr. Ryan opined that the highest and best use of the Subject Property before the granting of the conservation easement would not be development as envisioned by Mr. Adams; rather, it would be "continued timber production, possible agriculture, recreation (primarily hunting and fishing), and extremely low-density residential use in conjunction with long-term speculative investment for alternative uses."[20] In ascertaining the highest and best use of the Subject Property, Mr. Ryan considered whether the proposed use was (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. And Mr. Ryan stated that each criterion should be considered sequentially for it would not matter if a given use is financially feasible, but not legally permissible.

Mr. Ryan noted that under the current zoning classification of rural residential, which allows for a development density of only one unit per five acres, the proposed development on the Subject Property would not be legally permissible.

Regarding uses that are physically possible, Mr. Ryan noted that generally, the size of the Subject Property is considered sufficient to accommodate the full range of uses that currently exist in the area as well as emerging speculative uses that may emerge in the future. Mr. Ryan noted that from this standpoint, the physical use potential of the Subject Property is considered good. Moreover, Mr. Ryan further noted that public sewer is not currently available and that "[i]f high density/intensity development was considered on the [Subject] [P]roperty, it would require construction of on-site sewage treatment and disposal facilities or connection to the existing sewer line at River North Subdivision." Notwithstanding the current state of the utilities on the Subject Property, Mr. Ryan ultimately concluded that the Subject Property's physical characteristics do not preclude any uses that are legally permissible.

As for financial feasibility, Mr. Ryan emphasized that financial feasibility is considered restricted to those uses that are determined to be physically possible and legally permissible. Uses that would generate a positive return are considered financially feasible. Mr. Ryan noted that on the basis of the Subject Property's location in an area that is

---

[20] Extremely low-density use refers to less than five units for the entire Subject Property.

[*29] dominated by silvicultural, agricultural, recreational, and/or moderate- to low-density residential uses, financially feasible uses of the Subject Property would include consideration of predominant land use trends in the surrounding area (i.e., silviculture, agriculture, and recreation) as well as residential development. However, when the overall market conditions are taken into account, the financially feasible uses shift toward continued silviculture, agriculture, and/or extremely low-density residential use with the recognition that the Subject Property would have the potential to be converted to higher-density uses—residential—in the mid- to long-term future.

In the light of the foregoing factors, Mr. Ryan determined that the highest and best use of the Subject Property at the time of donation would have been for a combination of silviculture, possible agriculture, and extremely low-density residential use so as not to interfere with mid- to long-term prospects for higher-density uses.

c. *Value of the Subject Property Before Granting of Conservation Easement*

In his appraisal, Mr. Ryan determined that the Subject Property had a fair market value of $4,750 per acre or $7,395,000 "before" the granting of the conservation easement. Mr. Ryan analyzed 12 comparable properties, which were selected for having attributes that lent themselves to being developed in a fashion similar to Mr. Adams's vision for the Subject Property. Mr. Ryan also emphasized the importance of the principle of substitution, which stands for the proposition that a hypothetical buyer will not pay more for a given property when an alternative property is available for less. According to Mr. Ryan, the comparable properties selected "had the exact same potential to have [Mr. Adams's] vision applied to them as [the Subject] [P]roperty did."

d. *Comparable Properties*

Mr. Ryan selected a total of 12 properties located in Georgia which he deemed comparable to the Subject Property. The comparable properties took into account the fact that the Subject Property is a premium property in an area where the typical competing parcel of land is not as well maintained and manicured. Mr. Ryan analyzed the comparable properties on the basis of three economic factors (financing terms, date of sale, and condition of sale) and nine physical factors (location, size, encumbrances, use potential, amenities, timber, utilities,

**[\*30]** topography, and accessibility). Regarding the comparable properties, Mr. Ryan made qualitative adjustments on the basis of their being inferior, superior, or similar to the Subject Property. The sales of the comparable properties occurred between April 2010 and December 2013 and involved parcels of land ranging from approximately 444.17 acres to 8,411.60 acres.

i.     *Comparable Property #1*

This property consists of approximately 561.68 acres of vacant land located on the northeast and southwest sides of Altman Road approximately 1.4 miles northwest of its intersection with Nathan Roberts Road in Jones County, Georgia. This property was sold in July 2010 for $900 or $1,602 per acre, which is reflective of the combined value of land and timber. Mr. Ryan noted that the fact that this property is significantly smaller than the Subject Property inflated the price per acre. Mr. Ryan found the property to be superior from the standpoint of encumbrances since it lacked an underground pipeline found on the Subject Property.

However, Mr. Ryan conceded that the property is inferior from the standpoint of the condition of sale on the basis of its being transferred under conditions that were favorable to the buyer. Its location was likewise considered inferior since it is located in a portion of Jones County that is distanced from the areas that have experienced any demand for development. The property has a less significant timber component as well.

Moreover, this property was considered inferior since it lacked significant amenity features and access to public roads. Mr. Ryan determined that the influences of the inferior characteristics outweighed the superior characteristics of the smaller size and lack of encumbrances. Therefore, comparable property #1 was considered inferior and its value per acre of $1,602 less than the value the Subject Property might be achievable in the market.

ii.     *Comparable Property #2*

This property consists of approximately 609.39 acres of vacant land located on the northwest side of U.S. Highway 129 across from its intersection with Stallings Road in Jones County, Georgia. This property was sold in December 2010 for $1,828,170 or $3,000 per acre, which is reflective of the combined value of the land and timber. As with comparable property #1, this property is significantly smaller than the

[*31] Subject Property. Mr. Ryan found this property to be superior regarding its topography since it has a higher percentage of plantable/upland.

However, this property's location was considered inferior since it is located in a portion of Jones County that is distanced from the areas that have experienced any demand for development. Mr. Ryan also found this property to be inferior in terms of encumbrances since it was transferred subject to outstanding mineral rights. Additionally, it was considered inferior from the standpoint of amenities, its lack of proximity to utilities, and limited road access. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #2 was considered inferior to the Subject Property, and its value per acre of $3,000 was less than the value the Subject Property might be able to achieve in the market.

### iii.    *Comparable Property #3*

This property consists of approximately 1,432.60 acres and is vacant acreage located on the northwest side of Davis Drive, the north and south sides of James Dykes Road, the east and west sides of Magnolia Road, and the north side of Centennery Road in Bleckley County, Georgia. This property sold in December 2011 and January 2012 for a total of $2,701,904 or $1,886 per acre, which is reflective of the combined value of the land and timber. This property is considered superior in terms of encumbrances since it lacks features such as a gas pipeline crossing over it.

However, this property was considered inferior from the standpoint of amenities and its lack of proximity to utilities. Mr. Ryan also considered this property inferior from the standpoint of topography given its inclusion of a lower percentage of plantable/upland. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #3 is considered inferior to the Subject Property and its value per acre of $1,886 was less than the value the Subject Property might be able to achieve in the market.

### iv.    *Comparable Property #4*

This property consists of approximately 444.17 acres and is vacant acreage located along the east side of Bunkham Road and the west side of Flint River in Talbot County, Georgia. This property sold in May 2012 for $1,066,100 or $2,400 per acre, which is reflective of the combined value of the land and timber. This property is significantly

[*32] smaller than the Subject Property. This property is considered superior in terms of encumbrances since it lacks features such as a gas pipeline crossing over it. It was likewise considered superior from the standpoint of topography since it included a higher percentage of plantable/upland.

However, its location is considered inferior since the property is further removed from significant population centers when compared to the Subject Property. Mr. Ryan also found this property to be inferior in terms of access and its lack of proximity to utilities. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #4 is considered inferior to the Subject Property and its value per acre of $2,400 was less than the value the Subject Property might be able to achieve in the market.

### v.    *Comparable Property #5*

This property consists of approximately 1,206.90 acres and is vacant acreage located on the north and south sides of Anderson Road and the east and west sides of Carlisle Road, east and south of the intersection of Nelson Road and Anderson Road, and the east and west sides of Bonnie Dixon Road and the south side of U.S. Highway 36 in Talbot County, Georgia. This property was sold in 2012 for $2,172,420 or $1,800 per acre, which is reflective of the combined value of the land and timber. This property was considered superior in terms of encumbrances since it lacked features such as a gas pipeline crossing over it.

However, its location was considered inferior since the property is further removed from significant population centers when compared to the Subject Property. Mr. Ryan also found the property to be inferior in terms of amenities, its lack of access to public utilities, and topography. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #5 is considered inferior to the Subject Property and its value per acre of $1,800 was less than the value the Subject Property might be able to achieve in the market.

### vi.    *Comparable Property #6*

This property consists of approximately 1,065.41 acres and is vacant acreage located on the west side of Pierce Dairy Road, the east side of Indian Creek Road, and the north side of Aqua Road in Morgan County, Georgia. This property was sold in December 2013 for $4,016,353 or $3,770 per acre. Mr. Ryan found this property to be

[*33] superior in terms of location and topography since it is relatively close to Atlanta and includes a higher percentage of plantable/upland.

However, it was considered inferior from the standpoint of encumbrances since the property is bifurcated by an active railroad right-of-way. Mr. Ryan also found the property to be inferior in terms of amenities and its lack of proximity to utilities. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #6 is considered inferior to the Subject Property and its value per acre of $3,770 was less than the value the Subject Property might be able to achieve in the market.

vii.    *Comparable Property #7*

This property consists of approximately 1,582.83 acres and is agricultural property located on the east side of State Road 195 across from its intersection with State Road 377 in Lee County, Georgia. This property sold partially in April 2010 and September 2010 for a total of $4,021,208 or $2,541 acre. After making adjustments for the value contribution of the improvements, the price per acre for the land and timber was $2,430. This property was considered superior in terms of encumbrances since it lacked features such as a gas pipeline crossing over it. Mr. Ryan also considered this property superior from the standpoint of use potential since it included irrigated agricultural land.

However, it was considered inferior from the standpoint of amenities and the fact that much of the merchantable timber had already been thinned before the sale. Mr. Ryan also found this property to be inferior in terms of its lack of proximity to utilities and topography that included a lower percentage of plantable/upland. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #7 is considered inferior to the Subject Property and its value per acre of $2,430 was less than the value the Subject Property might be able to achieve in the market.

viii.    *Comparable Property #8*

This property consists of approximately 8,411.60 acres and is a shooting plantation located on the east and west sides of Philema Road and the south side of State Road 32 in Lee County, Georgia. This property sold in January 2011 for $19,550,000 or $2,324 per acre. After adjustments for the value contribution of the improvements, the price per acre for the land and timber was $2,205. This property is considered

**[*34]** superior in terms of use potential since it included irrigated agricultural land.

However, it was considered inferior from the standpoint of conditions of sale since the property was transferred under conditions that were favorable to the buyer. Mr. Ryan recognized that this property was substantially larger than the Subject Property, which typically resulted in a deflated price per acre. Mr. Ryan also found this property to be inferior in terms of its lack of proximity to utilities and topography that included a much lower percentage of plantable/upland. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #8 is considered inferior to the Subject Property and its value per acre of $2,205 was less than the value the Subject Property might be able to achieve in the market.

ix.    *Comparable Property #9*

This property consists of approximately 1,319.10 acres and is a hunting plantation located along the north side of the U.S. Highway 84 Bypass and the west side of State Road 3, along the southeast bank of the Ochlockonee River, in Thomas County, Georgia. The property sold partially in December 2012 and June 2013 for a total of $8,673,800 or $6,576 per acre. After making adjustments for the value contribution of the improvements, the price per acre for the land and timber was $4,971. Mr. Ryan considered this property superior in terms of location since it is in the heart of the Thomasville Shooting Plantation Belt.

However, the property was considered inferior in terms of its lack of proximity to utilities and topography that included a much lower percentage of plantable/upland. The inferior and superior characteristics were considered equal; therefore, comparable property #9 is considered a reliable indicator of the value the Subject Property might achieve in the Market.

x.    *Comparable Property #10*

This property consists of approximately 1,682.39 acres and was a hunting plantation located on the east side of State Road 93 and southeast of Lower Cairo Road, in Grady County, Georgia. This property sold in March 2013 for $6,996,817 or $4,159 per acre. After making adjustments for the value contribution of the improvements, the price per acre for the land and timber was $3,267. Mr. Ryan considered this property superior from the standpoint of topography since it included a higher percentage of plantable/upland.

**[*35]** However, the property was considered inferior in terms of its amenities and lack of proximity to utilities. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #10 is considered inferior to the Subject Property, and its value per acre of $3,267 was less than the value the Subject Property might be able to achieve in the market.

### xi.    *Comparable Property #11*

This property consists of approximately 6,868 acres and is vacant acreage located on the north and south sides of Gillionville Road and on the west side of Old Thompson Road, in Dougherty County, Georgia. This property sold in April 2013 for $29,160,000 or $4,246 per acre. After making adjustments for the value contribution of improvements, the price per acre for the land and timber was $3,605. Mr. Ryan considered this property superior from the standpoint of encumbrances since it lacked a gas pipeline crossing over it.

However, this property was considered inferior in terms of topography since it included a much lower percentage of plantable/upland. Mr. Ryan recognized that this property is substantially larger than the Subject Property, which typically results in a deflated price per acre. It was also considered inferior as a result of the property's containing significantly less timber. The inferior characteristics outweighed the superior characteristics; therefore, comparable property #11 is considered inferior to the Subject Property, and its value per acre of $3,605 was less than the value the Subject Property might be able to achieve in the market.

### xii.    *Comparable Property #12*

This property consists of approximately 2,333.27 acres and is a hunting plantation located on the southeast side of Meridian Road and on the west side of U.S. Highway 319, in Grady County, Georgia. This property sold in June 2013 for $10,499,715 or $4,500 per acre. After making adjustments for the value contribution of improvements, the price per acre for the land and timber was $4,457. Mr. Ryan considered this property superior from the standpoint of encumbrances since it lacked a gas pipeline crossing over it. It was also considered superior regarding topography since the property included a higher percentage of plantable/upland.

However, this property was considered inferior in terms of its amenities and lack of proximity to utilities. The inferior and superior

**[*36]** characteristics were considered equal; therefore, comparable property #12 is considered a reliable indicator of the value the Subject Property might achieve in the Market.

After analyzing the 12 foregoing properties, Mr. Ryan found comparable properties #9 and #12 to have overall characteristics equal with the Subject Property, and therefore they formed the basis for his value conclusion for the Subject Property of $7,395,000 or $4,750 per acre. Additionally, Mr. Ryan performed a best case scenario discounted cashflow analysis, which, after taking into account development costs, resulted in a net present value per acre of $4,500. Consequently, Mr. Ryan determined that the discounted cashflow analysis validated his ultimate conclusion under the comparable sales method as to the value of the Subject Property.

e.    *Value of the Subject Property After Granting of Conservation Easement*

In determining the "after" value of the Subject Property, Mr. Ryan noted that the various restrictions imposed on the Subject Property as a result of granting the conservation easement reduced the property's use potential from that in the "before" situation and placed it at a marketable disadvantage in the "after" situation.

Mr. Ryan used the comparable sales method to determine the "after" value of the Subject Property, analyzing sales of properties with conservation easements in place occurring close in time to the effective date of his report. Mr. Ryan determined that the conservation easement would not have any effect on the excluded parcels since they were constructed for the purpose and intent of being used with, and surrounded by, a large undeveloped parcel of land; therefore, the value of the excluded parcels will be the same in the "before" and "after" situations. Moreover, Mr. Ryan made qualitative adjustments to the comparable properties.

Mr. Ryan identified four properties (in addition to the 12 selected above) that he deemed comparable to the Subject Property in the "after" situation. The four selected properties were all sold with conservation easements in place and yielded sale prices from $200 to $1,806 per acre. These properties were sold between August 2010 and April 2013 and ranged in size from approximately 513.91 to 2,711 acres. Mr. Ryan determined that the Subject Property in the "after" situation was worth more than the two properties he deemed inferior with values from $200

**[\*37]** to $1,012 per acre and that its value was more in line with the remaining two properties, which had per-acre prices in the $1,356 to $1,806 range.

Ultimately, Mr. Ryan concluded that the Subject Property in the "after" situation had a value of $2,800,000 or $1,800 per acre, which is in the upper range of the selected comparable properties, appropriate since it included various parcels that remain unencumbered by the conservation easement.

### f.     *Estimated Deduction Amount*

Mr. Ryan estimated the amount of a potential deduction to be $4,595,000, which is the difference between the "before" value of $7,395,000 and the "after" value of $2,800,000.

### 2.     *Raymond Krasinski*

Respondent engaged Raymond Krasinski to prepare an appraisal review of Mr. Hayter's 2013 appraisal of the Subject Property for its compliance with USPAP. Mr. Krasinski is a member of the Appraisal Institute, holding its MAI designation in addition to being a General Review Senior, which qualifies him to perform appraisal reviews. Mr. Krasinski was recognized by the Court as an expert in real property appraisals, appraisal review, and USPAP. Mr. Kasinski concludes that Mr. Hayter's 2013 appraisal contains significant errors and that it fails to comply with USPAP.

Specifically, Mr. Krasinski argued that Mr. Hayter's appraisal, among other things, fails to identify the competitive basis of the Subject Property as a large vacant parcel; ignores numerous directly competitive sales; relies on an inappropriate valuation technique; uses a discounted cashflow analysis as the only approach to value; and fails to provide any local market data to support market absorption.

On the basis of the foregoing factors, Mr. Krasinski stated that Mr. Hayter's appraisal appears to vastly overstate the value of the conservation easement.

### 3.     *Steven Hastings*

Respondent engaged Steven Hastings to perform an independent analysis and review of Ms. Sward's retrospective market analysis report and of the discounted cashflow analysis in Mr. Hayter's 2013 appraisal.

**[*38]** At trial Mr. Hastings was accepted by the Court as an expert in the areas of discounted cashflow analysis and feasibility studies.

### a.  *Discounted Cashflow Analysis*

Mr. Hastings evaluated and opined on the inputs used in Mr. Hayter's discounted cashflow analysis, concluding that the proposed development was not feasible or viable and would not generally be considered financeable by a financial institution.

Mr. Hastings formed his conclusion on the basis of alleged errors and methodological problems. Regarding the errors, Mr. Hastings noted that Mr. Hayter failed to include developmental costs for the estate lots in the planned development, miscalculated real estate taxes, mismatched construction costs and timing, and incorrectly cited the discount rate source.

Methodological problems include issues with the lack of entitlements, inappropriate timing of development cost and initial sales, failure to consider entitlement and additional development costs, incorrect application of discount rate and developer profit, failure to properly analyze sales price data, failure to apply appropriate absorption methodology, and failure to sufficiently analyze the difficulty of permitting and sewage disposal system costs.

Mr. Hastings took particular issue with the comparable properties selected by Mr. Hayter. Mr. Hastings determined that more appropriate comparable properties would have been local developments, such as Healy Plantation, Little Creek Plantation, and the River Forest Subdivision, which would have produced significantly lower lot values in the proposed development.

Notwithstanding the supposed errors and methodological problems in Mr. Hayter's discounted cashflow analysis, Mr. Hastings was able to recreate his discounted cashflow analysis using the underlying data in Mr. Hayter's 2013 appraisal, despite his assertion that the proposed development would not be considered financeable by a financial institution.

### b.  *Retrospective Market Analysis Critique*

Mr. Hastings concluded that Ms. Sward's retrospective market analysis, which analyzed the market demand for second homes in vacation and recreational settings, is fundamentally flawed for multiple

**[\*39]** reasons. Since the Court has already found Ms. Sward's retrospective market analysis to be unhelpful in determining whether the proposed development was feasible, we need not address Mr. Hastings's critique thereof in any more detail.

## OPINION

I.  *Burden of Proof*

Ordinarily, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous.[21] Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). That burden includes proving entitlement to any deductions claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Petitioner therefore generally bears the burden of proving the Partnership's entitlement to the charitable deduction for qualified conservation contributions under the applicable provisions of section 170, as well as the burden of proving the value of the conservation easement.

In order to establish its entitlement to the charitable contribution deduction at issue, petitioner must show (1) that the Partnership made a qualifying contribution, (2) that it satisfied (or is excused from) the substantiation requirements for such a contribution, and (3) the value of the contribution. *See Murfam Enters. LLC v. Commissioner*, T.C. Memo. 2023-73, at \*15. All three requirements must be met for the donation to be a qualified conservation contribution. *See Simmons v. Commissioner*, T.C. Memo. 2009-208, 2009 WL 2950610, at \*3, *aff'd*, 646 F.3d 6 (D.C. Cir. 2011).

II.  *Qualified Conservation Contribution*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. The Code generally restricts a taxpayer's charitable contribution deduction for donations of "an interest in property which consists of less than the taxpayer's entire interest in such property." I.R.C. § 170(f)(3)(A). That is, someone who

---

[21] As to the burden of production, section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount." However, section 7491(c) does not apply to TEFRA partnership-level proceedings, such as this case. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Therefore, petitioner bears not only the burden of proof, but also the burden of production, even as to any penalty.

**[\*40]** owns property and donates to charity only a partial interest in that property may not claim a charitable contribution deduction for that donation. However, the statute provides an exception—and allows a deduction—for a "qualified conservation contribution." I.R.C. § 170(f)(3)(B)(iii). Section 170(h)(1) defines a "qualified conservation contribution" to be (1) the contribution of a "qualified real property interest" (2) to a "qualified organization" (3) "exclusively for conservation purposes." The parties agree that SERLC is a qualified organization for purposes of section 170(h)(1)(B) and have stipulated that the conservation easement satisfies one of the conservation purposes defined under section 170(h)(4). Accordingly, we need only address whether the Partnership contributed a qualified real property interest.

Under section 170(h)(2)(C) a "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of the real property." The Partnership donated to SERLC a perpetual conservation easement on approximately 1,545.79 acres of the Subject Property, which severely restricts its use of the property in accordance with Article II of the conservation easement deed, which lists the various restrictions imposed. Consequently, we determine that the Subject Property satisfies the definition of a qualified real property interest under section 170(h)(2)(C).

However, respondent makes two arguments regarding why the Partnership did not make a qualified conservation contribution. First, respondent argues that the conservation easement fails to provide SERLC a proportionate share of the extinguishment proceeds as required by the applicable Treasury Regulations. Second, respondent argues that the Partnership lacked the requisite donative intent. We address each argument below.

A.    *Whether the Conservation Easement Deed Satisfies Treasury Regulation § 1.170A-14(g)(6)(ii)*

Respondent seeks to negate petitioner's claim of compliance with section 170(h)(2)(C) by relying on Treasury Regulation § 1.170A-14(g), which sets forth the substantive rules to safeguard the perpetual protection of the conservation purpose. Under the Code, for a contribution to be made exclusively for conservation purposes, the conservation purpose must be protected in perpetuity. I.R.C. § 170(h)(5)(A). Treasury Regulation § 1.170A-14(g)(6) outlines the circumstances under which an easement may be considered protected in

**[\*41]** perpetuity even if it is later extinguished by judicial proceeding on the basis of "subsequent unexpected changes in the conditions surrounding the donated property that make it impossible or impractical to continue using the property for the intended conservation purpose." *Carroll v. Commissioner*, 146 T.C. 196, 211–12 (2016). Treasury Regulation § 1.170A-14(g)(6)(ii) requires that

> for a deduction to be allowed under this section, at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time . . . bears to the value of the property as a whole . . . . [T]hat proportionate value of the donee's property rights shall remain constant.

Respondent argues that the requirements of Treasury Regulation § 1.170A-14(g)(6)(ii) are to be strictly construed and that the conservation deed at issue violates the regulation since SERLC is not guaranteed to receive the proportionate share of the extinguishment proceeds; rather, it would only have a right to a fixed amount. Needless to say, petitioner disagrees and avers that respondent's reliance on Treasury Regulation § 1.170A-14(g)(6)(ii) is misplaced since the U.S. Court of Appeals for the Eleventh Circuit held that Treasury Regulation § 1.170A-14(g)(6)(ii) is "arbitrary and capricious and violates the APA's procedural requirements" and ultimately ruled it to be invalid. *Hewitt v. Commissioner*, 21 F.4th 1336, 1339 (11th Cir. 2021), *rev'g and remanding* T.C. Memo. 2020-89.[22]

Absent stipulation to the contrary, appeal of this case would lie to the Eleventh Circuit. *See* I.R.C. § 7482(b)(1)(E). Respondent argues that the conservation easement deed in this case presents facts sufficiently different from those present in *Hewitt* to render the Eleventh Circuit's opinion not "squarely on point" and therefore not binding on this Court. *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). Instead, respondent would have us follow our decision in *Oakbrook Land Holdings, LLC v. Commissioner*, 154 T.C. 180 (2020), *aff'd*, 28 F.4th 700 (6th Cir. 2022), which, unlike the Eleventh Circuit

---

[22] The Eleventh Circuit subsequently confirmed that *Hewitt* invalidated paragraph (g)(6)(ii) of Treasury Regulation § 1.170A-14. *Glade Creek Partner, LLC v. Commissioner*, No. 21-11251, 2022 WL 3582113, at \*3 (11th Cir. Aug. 22, 2022), *aff'g in part, vacating in part and remanding* T.C. Memo. 2020-148.

[*42] decision in *Hewitt*, upheld the substantive and procedural validity of Treasury Regulation § 1.170A-14(g)(6)(ii).

We remind respondent that this Court will depart from its established precedents and defer to contrary precedent of a particular court of appeals only to avoid "inevitable" reversal. *See Lardas v. Commissioner*, 99 T.C. 490, 494–95 (1992). To follow the U.S. Court of Appeals for the Sixth Circuit's precedent in this case would surely result in reversal; therefore, we are bound to follow the Eleventh Circuit, which invalidated Treasury Regulation § 1.170A-14(g)(6)(ii).

In the light of the foregoing, we find respondent's argument, that the charitable contribution deduction should be denied in full on the basis of the conservation purpose's not being protected in perpetuity as required by section 170(h)(5)(A) and in violation of Treasury Regulation § 1.170A-14(g)(6)(ii), to be meritless.

B.    *Donative Intent*

Respondent argues that the Partnership lacked the requisite donative intent, and he contends that the charitable contribution was made only for the personal profit of the Managers by enticing potential investors with federal income tax deductions. He further argues that the conservation easement deal was priced so that the return for the investors in tax savings would substantially exceed the amounts that they would have to contribute, without which they would not have invested.

Additionally, respondent argues Mr. Adams controlled the decision to move forward with the conservation easement proposal, an investor tax benefit ratio of more than four times their investment was all but certain, and that none of the Managers or investors "focused on the benefits of land preservation or whether SERLC could appropriately steward the donation." Consequently, respondent contends this Court must find that the Partnership lacked any charitable intent and deny the charitable deduction in full.

We rejected similar donative intent arguments made by the Commissioner in *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at *28, and *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25, at *37, and we reject them again here. In *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at *28, we found the objective fact that a perpetual conservation easement was donated to a charitable organization defeated the Commissioner's contention as to the donor's

[*43] subjective intent. Similarly, the investors in the Partnership were presented with and given the opportunity to vote on three options for the Subject Property: a development proposal, an investment proposal, and a conservation easement proposal. The investors unanimously voted in favor of the conservation easement proposal, choosing present tax benefits over potential future earnings.

Respondent takes particular issue with the fact that Mr. Adams could override the investor vote and contends that the conservation easement was always going to be donated. However, respondent fails to address the fact that all investors voluntarily voted in favor of the conservation easement proposal and that Mr. Adams did not exercise his ability to override their vote. Furthermore, the fact "[t]hat federal income tax benefits are a consideration in determining whether to make a contribution does not undermine the validity of the contribution." *Id.*

Respondent cites two Supreme Court cases, *Hernandez v. Commissioner*, 490 U.S. 680, 682 (1989), and *United States v. American Bar Endowment*, 477 U.S. 105 (1986), and contends that the members of the Partnership received privileges or other benefits, i.e., receipt of a quid pro quo, and therefore lacked the requisite donative intent. We find these cases to be distinguishable since there is no evidence in the record of the members' receiving a financial return commensurate with the amount of charitable contribution, other than a tax deduction. *Hernandez v. Commissioner*, 490 U.S. at 690–91. Congress long ago decided to incentivize charitable contributions by allowing deductions for those contributions, and it would be improper for us to deny a deduction to a donor simply because he has received a tax benefit in exchange. Moreover, we are aware of no case in which the tax benefits associated with a charitable contribution deduction have been deemed a "quid pro quo" that negates the donor's charitable intent. *See Oconee Landing Prop., LLC*, T.C. Memo. 2024-25, at *38.

Therefore, we find that the Partnership had the requisite donative intent when it made a charitable contribution of property to SERLC.

III.    *Compliance with the Substantiation Requirements*

"A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." I.R.C. § 170(a)(1). We briefly summarize the statutory and regulatory requirements before addressing respondent's contention that the

[*44] Partnership failed to satisfy the qualified appraiser or qualified appraisal requirements.

A.    *Statutory and Regulatory Requirements*

Section 170(f)(11) imposes, for charitable contribution deductions, heightened substantiation requirements on taxpayers, depending on the value of the contribution. Section 170(f)(11)(A)(i) provides that for deductions greater than $500,000, a taxpayer must attach "a description of such property," *see* I.R.C. § 170(f)(11)(B), obtain "a qualified appraisal of such property," *see* I.R.C. § 170(f)(11)(C), and "attach[] to the return for the taxable year a qualified appraisal of such property," *see* I.R.C. § 170(f)(11)(D).

Treasury Regulation § 1.170A-13(c)(3)(ii) provides that a "qualified appraisal" must contain, among other things, the following information: (1) a description of the property; (2) the date(s) on which the property was appraised; (3) the property's fair market value; (4) the method used to value the property; and (5) the specific basis for the valuation and a justification of that basis.

Treasury Regulation § 1.170A-13(c)(3)(i)(B) provides that a qualified appraisal must be "prepared, signed, and dated by a qualified appraiser." A "qualified appraiser" must (1) hold himself out to the public as an appraiser, (2) be qualified to make appraisals of the type of property being valued, and (3) acknowledge that aiding and abetting an understatement of tax liability may subject him to a penalty pursuant to section 6701. Treas. Reg. § 1.170A-13(c)(5)(i). Moreover, a qualified appraiser cannot be one who (1) receives a deduction under section 170 for the contribution of the property that is being appraised, (2) was a party to the donor's acquisition of the property being appraised, (3) is the donee of the property, (4) was a person employed by any of the aforementioned, (5) is related to any of the aforementioned within the meaning of section 267(b) (not applicable here), or (6) is an appraiser regularly engaged by any of the aforementioned who does not make a majority of his appraisals for other persons during the taxable year. *Id.* subdiv. (iv).

B.    *Whether Mr. Hayter Was a Qualified Appraiser*

Respondent does not seem to contest that Mr. Hayter satisfies the requirements of Treasury Regulation § 1.170A-13(c)(5)(i); rather, he seeks to disqualify Mr. Hayter as a qualified appraiser under the theory that he runs afoul of subdivision (ii) of Treasury Regulation

**[\*45]** § 1.170A-13(c)(5). The so-called knowledge regulation provides, in relevant part, that

> [a]n individual is not a qualified appraiser with respect to a particular donation . . . if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property . . . .

Treas. Reg. § 1.170A-13(c)(5)(ii). The regulation gives the following illustration: "[T]he donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property . . . ." *Id.* The foregoing regulation uses the term "a reasonable person," which we read to mean a reasonably informed person without specific knowledge or experience in generally accepted appraisal practices. In other words, the question becomes whether the Partnership held specific knowledge of facts that would cause us to expect Mr. Hayter's opinion of value to be falsely overstated. We find there are none in this case.

In gauging a partnership's "knowledge," we look to the knowledge of the person(s) with ultimate authority to manage the partnership. *See, e.g.*, *CNT Invs., LLC v. Commissioner*, 144 T.C. 161, 222 (2015) (examining the general partner's knowledge in order to assess "good faith"); *Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 91–92 (2011) (stating that partnership-level defenses take "into account the state of mind of the general partner"), *supplemented by* T.C. Memo. 2012-110, *aff'd*, 728 F.3d 676 (7th Cir. 2013). We have also indicated how the expression "'falsely to overstate' is intended to convey a sense of collusion and deception as to the value of the property." *Kaufman v. Commissioner*, T.C. Memo. 2014-52, at \*70–71 (footnote omitted), *aff'd*, 784 F.3d 56 (1st Cir. 2015); *see also Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at \*42–43.

Respondent points to facts about the Subject Property that were known to Mr. Adams and the other Managers of the Partnership that tend to undermine Mr. Hayter's valuation conclusion and ultimately the claimed deduction amount. Namely, respondent argues that Mr. Adams provided Mr. Hayter with skewed information that he relied upon in his 2013 appraisal, that he withheld information concerning the 2012 P&S Agreement to purchase the Subject Property for $6 million, and that he failed to inform Mr. Hayter that the Subject Property was previously

**[\*46]** listed for $9 million without any interest from market participants. However, the example given in the regulation does not support respondent's contention but focuses rather on whether there was "an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property." *See* Treas. Reg. § 1.170A-13(c)(5)(ii).

There is no evidence of an "agreement" between Mr. Adams and Mr. Hayter concerning the value of the Subject Property. In fact, when asked whether Mr. Adams had a specific value that he wanted him to reach in his appraisal of the Subject Property, Mr. Hayter testified that he "never enter[s] into an appraisal with a predetermined value," that the market determines "what the fair market value is," and that he stands by the valuation opinion reflected in his report.

As the trier of fact, we observe a witness's candor, sincerity, and demeanor in order to evaluate the testimony and assign it appropriate weight in determining disputed facts. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 84 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). We are not bound to accept a taxpayer's self-serving testimony. *See Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986); *Hradesky v. Commissioner*, 65 T.C. 87, 90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976). While respondent might disagree with the methodology and valuation conclusions in Mr. Hayter's 2013 appraisal, we find his testimony credible to negate an inference—as asserted by respondent— that Mr. Adams "heavily influenced and manipulated the appraisal process to achieve his desired result."

Mr. Hayter is a professional appraiser who holds the MAI designation from the Appraisal Institute, held himself out to the public as such, and was qualified to perform an appraisal of the Subject Property with the proposed development plan in place. Moreover, he signed Form 8283, which was attached to the Partnership's Form 1065, acknowledging that he could personally be subject to penalties under the Code, including sections 6701(a) and 6695A. Mr. Hayter did not have a personal interest in the Subject Property, nor does it appear from the record that he received a tax deduction under section 170 for the contribution of the Subject Property being appraised. *See* Treas. Reg. § 1.170A-13(c)(5)(iv)(A).

Consequently, we find that respondent has failed to establish the applicability of Treasury Regulation § 1.170A-13(c)(5)(ii) and therefore

**[\*47]** hold that Mr. Hayter was a "qualified appraiser." *See* Treas. Reg. § 1.170A-13(c)(5).[23]

    C.    *Whether Mr. Hayter's 2013 Appraisal Was a Qualified Appraisal*

To be a qualified appraisal under section 170(f)(11)(E), an appraisal of property must be (1) treated as a qualified appraisal under regulations or other guidance prescribed by the Secretary and (2) conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed by the Secretary.

Treasury Regulation § 1.170A-13(c)(3) defines a qualified appraisal as a document that, among other things (1) relates to an appraisal that is made not earlier than 60 days before the date of contribution of the appraised property and not later than the due date (including extensions) of the return on which a deduction is first claimed under section 170; (2) is prepared, signed, and dated by a qualified appraiser; (3) includes (a) a description of the property appraised, (b) the fair market value of the property on the date of contribution, and the specific basis for the valuation, (c) a statement that the appraisal was prepared for income tax purposes, (d) the qualifications of the qualified appraiser, and (e) the signature and taxpayer identification number of the appraiser; and (4) does not involve an appraisal fee that violates certain prescribed rules.

The regulation imposes substantive requirements on the content of an appraisal report. *Scheidelman v. Commissioner*, 682 F.3d 189, 198 (2d Cir. 2012), *vacating and remanding* T.C. Memo. 2010-151. A qualified appraisal provides the IRS with sufficient information to evaluate the claimed deduction and deal more effectively with the prevalent use of overvaluation. *Hewitt v. Commissioner*, 109 T.C. 258, 265 (1997), *aff'd per curiam*, 166 F.3d 332 (4th Cir. 1998) (unpublished table decision).

Petitioner argues, and we agree, that Mr. Hayter's 2013 appraisal satisfies the regulatory requirements for a qualified appraisal as set forth above. *See* Treas. Reg. § 1.170A-13(c)(3). Respondent does not seem to contest this fact; however, he seeks to disqualify Mr. Hayter's 2013

---

[23] This ruling does not mean that we accept Mr. Hayter's opinion of value or that petitioner did not have reason to question his valuation; it is only to say that, with respect to the technical meaning of the term "qualified appraiser," he was qualified.

**[\*48]** appraisal from being a qualified appraisal on the basis of his contention that it was not prepared in accordance with generally accepted appraisal standards, alleging noncompliance with USPAP. We address respondent's contention below.

Section 170(f)(11)(E)(i)(II) specifies, in relevant part, that a qualified appraisal must be "conducted by a qualified appraiser in accordance with generally accepted appraisal standards." The Department of the Treasury provided transitional guidance in I.R.S. Notice 2006-96, 2006-2 C.B. 902. According to that Notice an appraisal will meet the specifications of section 170(f)(11)(E) if, for example, "the appraisal is consistent with the substance and principles of [USPAP]". Notice 2006-96, § 3.02(2), 2006-2 C.B. at 902.

Respondent states that Mr. Hayter outright failed to comply with USPAP, arguing that "his departures from USPAP are significant, serious, and seemingly intentionally designed to create a report simply to justify the value hoped by the Partnership." Specifically, respondent avers, among other things, that Mr. Hayter failed to report the Subject Property's prior sales history, inappropriately ignored comparable sales that disprove his valuation, failed to analyze the local market, failed to support his cost projections, failed to analyze demand for housing and absorption, and used inappropriate comparables for lot pricing. Petitioner argues that Mr. Hayter's 2013 appraisal "substantially complies with appraisal standards because it allowed respondent to properly understand and monitor the claimed contribution." We agree with petitioner's arguments.

"Appraising is not an exact science and has a subjective nature." *Gorra v. Commissioner*, T.C. Memo. 2013-254, at \*48. USPAP is widely recognized and accepted as setting out standards applicable to the appraisal profession. Adherence to those standards is evidence that the appraiser is applying methods that are generally accepted within the appraisal profession. Therefore, at a minimum, compliance with USPAP is an indication that the appraiser's valuation report is reliable. However, full compliance with USPAP is not the sole measure of reliability. *See Whitehouse Hotel Ltd. P'ship v. Commissioner*, 131 T.C. 112, 127–28 (2008),[24] *vacated and remanded*, 615 F.3d 321 (5th Cir.

---

[24] While this case deals with the admissibility of an expert report rather than whether the report was a qualified appraisal under the Code, we find the case to be illustrative of the subjective nature of appraisals and in stark contrast to the rigid standard of compliance respondent would have this Court adopt, which is something we will refrain from doing here.

[*49] 2010). We generally accept Mr. Krasinski's expert opinion that Mr. Hayter's 2013 appraisal lacks full compliance under USPAP; however, we find these failures go more to the credibility and weight of the appraisal and not to whether the appraisal complies with generally accepted appraisal standards. Notwithstanding the highest and best use conclusions reached for the Subject Property, we cannot say the appraisal fails to comply with generally accepted appraisal standards.

In sum, we find that Mr. Hayter's 2013 appraisal satisfies the requirements of section 170(f)(11)(E)(i)(II). Accordingly, we hold that Mr. Hayter's 2013 appraisal was a qualified appraisal for purposes of section 170(f)(11).

## IV.    *Valuation of the Conservation Easement Donation*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property is the "fair market value" of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1). Treasury Regulation § 1.170A-1(c)(2) defines fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." With respect to valuing a donation of a partial interest in property, Treasury Regulation § 1.170A-7(c) provides that "[e]xcept as provided in § 1.170A-14, the amount of the deduction under section 170 . . . is the fair market value of the partial interest at the time of the contribution." Treasury Regulation § 1.170A-14(h)(3)(i) in turn sets forth the following method for valuing a perpetual conservation restriction:

> If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction

**[*50]** covering a portion of the contiguous property owned by a donor and the donor's family . . . is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction.

The fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965). In this case we do not have "a substantial record of sales of easements comparable to the donated easement," and we will therefore base our valuation on the before and after method. *See* Treas. Reg. § 1.170A-14(h)(3)(i). Treasury Regulation § 1.170A-14(h)(3)(ii) provides:

> If before and after valuation is used, the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

*See also Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986). A property's highest and best use is the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson v. United States*, 292 U.S. 246, 255 (1934).

The two methods generally used to determine the "before value" and the "after value" are the comparable sales[25] and income methods. The comparable sales method looks at arm's-length transactions that involve properties similar to the subject property and sold within a

---

[25] *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119 (1975) ("In the case of vacant, unimproved property the 'market data' or 'comparable sales' approach is generally the most reliable method of valuation, the rationale being that the marketplace is the best indicator of value, based on the conflicting interests of many buyers and sellers. This in turn is based on the principle of substitution, i.e., that a prudent man will pay no more for a given property than he would for a similar property. This method requires gathering information on sales of property similar to the subject property, then comparing and weighing them to reach a likely value for the land being appraised."), *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision).

**[\*51]** reasonable time of the valuation date. *See, e.g., Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979); *Butler v. Commissioner*, T.C. Memo. 2012-72, 2012 WL 913695, at \*16. The income approach projects the future cashflows the property will generate at its highest and best use. *See, e.g., Butler v. Commissioner*, 2012 WL 913695, at \*17; *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 2010 WL 5395108, at \*4, *aff'd*, 493 F. App'x 944 (10th Cir. 2012). This method assumes that an investor would pay no more than the present value of the property's anticipated future income. *Butler v. Commissioner*, 2012 WL 913695, at \*17.

To show the value of the conservation easement, including the property's highest and best use before and after the donation, the parties have offered the reports and testimony of expert witnesses. *See* Rule 143(g). "Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue," and we evaluate expert opinions "in light of the demonstrated qualifications of the expert and all other evidence of value." *Parker v. Commissioner*, 86 T.C. 547, 561 (1986) (citing Fed. R. Evid. 702). Where experts offer competing estimates of fair market value, we decide how to weight those estimates by, among other things, examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990). We may also reach a decision as to the value of property that is based on our own examination of the evidence in the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

With these principles in mind, we will now explain the basis of our valuation of the conservation easement, i.e., the value of the Subject Property.

Petitioner's valuation expert, Mr. Hayter, used a discounted cashflow analysis, which is a subset of the income approach, and the comparable sales method to value the Subject Property in the "before" and "after" situations, respectively. He valued the land before the granting of the conservation easement (i.e., the before value) at $50,480,000 and at an "after" value of $2,680,000. If petitioner's expert is correct, the conservation easement would have a fair market value of $47,570,000.

**[\*52]** Respondent's valuation expert, Mr. Ryan, used the comparable sales method to value the Subject Property in both the "before" and "after" situations. He determined a "before" value of $7,395,000 and an "after" value of $2,800,000. If respondent's expert is correct, the conservation easement would have a fair market value of $4,595,000.

The large disparity in the parties' fair market value estimates lies in their disagreement as to the highest and best use of the Subject Property at the time the conservation easement was donated to SERLC as well as the comparable property sales used in their respective analyses. Therefore, we must determine the highest and best use of the Subject Property before the conservation easement grant and whether the comparable property sales were appropriate.

Notably, Mr. Hayter and Mr. Ryan, in essence, agree on the "after" value assessment of the Subject Property as being $2,800,000 and $2,680,000, respectively. Consequently, the dispute centers on the "before" value assessment of the Subject Property.

A.    *Before Value Determination*

In determining the fair market value of property, we first must determine its highest and best use. *See Stanley Works & Subs.*, 87 T.C. at 400; Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). In determining a property's highest and best use we consider the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. *Olson*, 292 U.S. at 255.

Both Mr. Hayter and Mr. Ryan began their respective highest and best use analyses by considering whether the potential use of the Subject Property was (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. Mr. Hayter determined that the highest and best use before the grant of the conservation easement was the "development of a 307 lot hunting and conservation oriented residential community," while Mr. Ryan determined the highest and best use to be "continued timber production, possible agriculture, recreation (primarily hunting and fishing), and extremely low-density residential use in conjunction with long-term speculative investment for alternative uses." All four criteria are required to be met, and it does not matter that a potential use is physically possible, financially feasible, and maximally productive if it is not legally permissible.

**[\*53]** For the reasons explained below we decline to accept Mr. Hayter's determination of the Subject Property's highest and best use, and therefore we do not adopt his opinion of value. On the other hand, we find Mr. Ryan's determination of the Subject Property's highest and best use to be compelling, and therefore we do adopt his opinion of value.

1.  *Whether the Proposed Development Was Legally Permissible*

Petitioner asserts that the proposed development was a legally permissible use of the Subject Property despite its zoning classification of rural residential, which allows for a development density of only one unit per five acres. Under this classification the proposed development would not be a legally permissible use of the Subject Property.

Notwithstanding the Subject Property's zoning classification, petitioner contends that the proposed development would be a legally permissible use on the basis of its contention that Mr. Pitrowski told Mr. Hayter that it was "very likely" that the Subject Property would receive rezoning and development approval. In addition, petitioner relies on the June 25, 2013, opinion letter that Mr. Pitrowski issued to Mr. Adams and Mr. Klesko stating that it is his "opinion that it is 'more likely than not' that if the [2013 Land Plan] . . . were submitted to this jurisdiction for a formal approval, given the current rules and regulations as we currently understand and interpret them, the land use/subdivision plan would be approved."

However, the evidence in the record contradicts petitioner's position that the Subject Property would receive a zoning variance to allow for development in accordance with the proposed development plan. While it is true that petitioner received a letter from Mr. Pitrowski, acting in his capacity as the Jones County Zoning director, stating that rezoning was "more likely than not," Mr. Pitrowski testified that he meant that to mean "[j]ust better than 50/50 that it would happen," on the basis of the information that he was given about the proposed development at the time. The letter was not a guarantee that the Jones County Planning and Zoning Department would actually approve rezoning.

At the time he issued his letter, Mr. Pitrowski was unaware that the proposed development planned on using gravel roads and community septic. Mr. Pitrowski testified that he would not have issued the same opinion and that he would have significant concerns about the

**[*54]** number of lots in the proposed development being served by gravel roads, which have resulted in "concerns for ambulances and life safety vehicles gaining access."

Moreover, in 2013 a community septic system with a discharge of wastewater of over 10,000 gallons per day required approval at the state level by the Georgia Environmental Protection Division. Petitioner does not contest that the proposed development would exceed 10,000 gallons per day of wastewater. Had Mr. Pitrowski been aware that community septic was going to be used, he would have had to submit the proposal to the Georgia Department of Public Health, which was not done in this case.

Given that Mr. Pitrowski did not have full knowledge of the facts surrounding the proposed development at the time he issued his letter and on the basis of his testimony at trial, it is not realistic to believe that the proposed development in its current form would have received rezoning or a zoning variance. Petitioner's expert makes an unreasonable assumption regarding the likelihood that rezoning of the Subject Property would actually be approved, an error that is fatal to his valuation conclusion.

In sum, we have serious concerns as to whether the proposed development at the Subject Property was a legally permissible use. However, even if we are to accept that the proposed development was a legally permissible use of the Subject Property, we must also determine whether the proposed development was physically possible, financially feasible, and maximally productive. Therefore, when considering the remaining highest and best use factors, we are inclined to accept the opinions and conclusion of Mr. Ryan

2.    *Comparable Property Sales*

Mr. Hayter's "before" value conclusion is based on the use of a discounted cashflow analysis using sales data from developments he deemed comparable to the Subject Property. However, only three of the developments are located in Georgia, with the other two being in South Carolina. All selected comparable developments can fairly be classified as high-end luxury resorts far from Jones County, with vastly different market conditions and amenity offerings, such as marinas, award-winning golf courses, restaurants, hotels, etc. While Mr. Hayter did make qualitative adjustments to the lot prices derived from his comparable properties, the values determined therefrom far exceed the

[*55] price that the proposed development might garner in the market. Mr. Hayter provided no data to support his contention that national home builders are acquiring large undeveloped land parcels in the near term for subdivision development or that "[r]esidential development pressure is moving north toward the [S]ubject [P]roperty." Additionally, Mr. Hayter provided no information concerning market conditions in the counties where his comparables were located nor any analysis of how they were similar to or different from Jones County.

On the other hand, Mr. Ryan provided a detailed analysis of the market conditions in Jones County, including land use patterns, building permit activity, population growth trends, etc., to support his conclusion that, in 2013, Jones County was still suffering the consequences of the 2008 housing market crash and that there was no indication that there would be a significant positive change in land use trends, development patterns, or population characteristics in the foreseeable future. Ultimately, Mr. Ryan concluded that the Subject Property was not ripe for development.

Mr. Ryan's "before" value is based on comparable sales data from 12 comparable properties, which he selected for having attributes that lent themselves to being developed in a manner similar to the proposed development. Moreover, Mr. Ryan selected these vacant parcels on the basis of the principle of substitution, which stands for the proposition that a hypothetical buyer will not pay more for a given property when an alternative property is available for less. This simple proposition undermines petitioner's "before" value conclusion since a willing buyer would not have paid roughly $32,600 ($50,480,000 / 1,545.79 acres) per acre for nonunique vacant land in Jones County when the price per acre for substitute properties identified by respondent's expert was between $1,602 and $4,971. Mr. Ryan likewise made qualitative adjustments to the selected properties and arrived at a per-acre value of $4,750 as appropriate for the Subject Property.

The substitute price for vacant land in and around Jones County reveals that petitioner's "before" value of $50,480,000 is formed on the basis of the proposed development's actually being built, and not on the basis of the value of the underlying property. Petitioner has failed to show to the Court's satisfaction that the plan for the proposed development could not be applied to Mr. Ryan's comparable properties or how the qualities or attributes of the Subject Property make it particularly unique in its state as a vacant parcel.

[*56] Treasury Regulation § 1.170A-14(h)(3)(ii) instructs us to make "an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed." Given the number of substitute properties available, we find it unlikely that the Subject Property would have been developed in accordance with the proposed development plan and that the probability of development at the selling price of $50,480,000 is firmly planted somewhere in the realm of fantasy.

Consequently, we find respondent's expert Mr. Ryan's "before" value of $4,750 per acre or $7,395,000, which was based on comparable vacant property sales, to be the proper value of the Subject Property and adopt it accordingly.

3. *Transactions Involving the Subject Property*

This Court has repeatedly affirmed that actual arm's-length sales occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation methods. *See ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at *14. Therefore, the sales history of the Subject Property is indicative of its true value. The Partnership initially acquired the Subject Property for $4,014,000 in separate purchases occurring between 1998 and 2006. In 2013 Big K paid $6 million to purchase a 99% interest in the Partnership. However, petitioner does not view the purchase of an interest in the Partnership as a sale of the Subject Property. While that might be true, we still find the purchase reflective of the price that the market would pay for the Subject Property, especially when the ownership interest was nearly 100% and the only asset held by the Partnership was the Subject Property itself. Therefore, we find Mr. Ryan's "before" value to be reasonable and supported by the record.

B. *After Value Determination*

Petitioner does not contest respondent's proposed finding of fact that Mr. Ryan's "after" value of $2,800,000 or $1,800 per acre is the fair market value of the Subject Property after the grant of the conservation easement. We therefore find that petitioner has conceded the issue. *See, e.g., Jonson v. Commissioner*, 118 T.C. 106, 108 n.4 (2002), *aff'd*, 353 F.3d 1181 (10th Cir. 2003). Accordingly, we accept respondent's "after" value determination.

[*57]  C.    *Charitable Contribution Amount*

As stated above, the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers "before" the granting of the restriction and the fair market value of the encumbered property "after" the granting of the restriction. *See* Treas. Reg. § 1.170A-14(h)(3)(i). We hold the amount of the Partnership's allowable charitable contribution deduction under section 170 to be $4,595,000, which is the difference between the "before" value of $7,395,000 and the "after" value of $2,800,000.

V.    *Penalties*

Respondent asserts that the Partnership is subject to the civil fraud penalty under section 6663, or, in lieu of a finding of fraud by this Court, the Partnership is subject to an accuracy-related penalty under section 6662. Regarding the accuracy-related penalty, respondent determined that a 40% penalty under section 6662(a) and (h) for a gross valuation misstatement is appropriate and, in the alternative, a 20% penalty under section 6662(a) and (b)(1), (2), and (3) for negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement should be imposed.

For the reasons below, we decline to impose the civil fraud penalty and sustain a 40% penalty under section 6662(a) and (h) for a gross valuation misstatement made by the Partnership.

A.    *Section 6663 Civil Fraud Penalty*

Section 6663(a) provides that, "[i]f any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." However, "[i]n any proceeding involving the issue whether the [taxpayer] has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary." I.R.C. § 7454(a). And that burden must be "carried by clear and convincing evidence." Rule 142(b). In *Parks v. Commissioner*, 94 T.C. 654, 660–61 (1980), we explained that "[t]o satisfy his burden of proof, . . . [the Commissioner] must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes."

[*58] The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Estate of Pittard v. Commissioner*, 69 T.C. 391 (1977); *Gajewski v. Commissioner*, 67 T.C. 181, 199 (1976), *aff'd*, 578 F.2d 1383 (8th Cir. 1978) (unpublished table decision). Fraud is not to be imputed or presumed, but rather must be established by some independent evidence of fraudulent intent. *Beaver v. Commissioner*, 55 T.C. 85, 92 (1970); *Otsuki v. Commissioner*, 53 T.C. 96 (1969). Fraud may not be found under "circumstances which at the most create only suspicion." *Davis v. Commissioner*, 184 F.2d 86, 87 (10th Cir. 1950); *Petzoldt v. Commissioner*, 92 T.C. 661, 700 (1989). However, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. *Spies v. United States*, 317 U.S. 492 (1943); *Stephenson v. Commissioner*, 79 T.C. 995 (1982), *aff'd per curiam*, 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. *Stone v. Commissioner*, 56 T.C. 213, 223–24 (1971); *Otsuki*, 53 T.C. at 105–06. The intent to conceal or mislead may be inferred from a pattern of conduct. *See Spies*, 317 U.S. at 499. Mere suspicion, however, is not enough to prove fraud. *E.g.*, *Katz v. Commissioner*, 90 T.C. 1130, 1144 (1988).

Courts have developed a nonexclusive list of factors, so-called badges of fraud, that demonstrate fraudulent intent. *See, e.g.*, *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992). Those badges of fraud include (1) understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) filing false Forms W–4; (8) failure to make estimated tax payments; (9) dealing in cash; (10) engaging in illegal activity; and (11) attempting to conceal illegal activity. *Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601.

The existence of any one badge is not dispositive, but the existence of several badges may be persuasive circumstantial evidence of fraud. *Niedringhaus*, 99 T.C. at 211. We may also consider a taxpayer's intelligence, education, and tax expertise in determining whether he acted with the requisite fraudulent intent. *See Holmes v. Commissioner*, T.C. Memo. 2012-251, at *31, *aff'd*, 593 F. App'x 693 (9th Cir. 2015).

Respondent contends that the Partnership is liable for the section 6663 civil fraud penalty and avers that the "record is replete with lies

[*59] and falsehoods promulgated by the Managers, led by [Mr.] Adams, to conceal the underlying tax avoidance scheme." However, for the reasons stated below, we find that respondent has failed to prove by clear and convincing evidence the applicability of the section 6663 civil fraud penalty.

In *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at *58, we stressed the importance of the express disclosure on the tax return of the principal facts about the conservation easement contribution in finding that the section 6663 civil fraud penalty was inapplicable. Additionally, charitable contribution deductions under section 170 are subject to a robust regime of substantiation and reporting requirements under section 170(f)(11), which requires a taxpayer claiming a deduction greater than $500,000 to provide information about the property being contributed, to attach a completed appraisal summary, and to attach a qualified appraisal. I.R.C. § 170(f)(11)(A)–(D). Under Treasury Regulation § 1.170A-13(c)(4)(ii), the appraisal summary required to be included with the taxpayer's return must include, among other things, the following information: (1) the date the donor acquired the property, (2) the cost or other basis of the property, and (3) the date the donee received the property. *Id.* subdiv. (ii)(D), (E), (G).

The reasoning behind these requirements is to allow for the "Commissioner's efficient identification of overvalued property." *Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at *17. When a taxpayer claims a charitable contribution deduction for recently purchased property, a wide gap between cost basis and claimed value raises a red flag suggesting that the return merits examination. Unless the taxpayer complies with the regulatory requirement that he disclose his cost basis and the date and manner of acquiring the property, the Commissioner will be deprived of an essential tool that Congress intended him to have.

This is not a case in which the donor intentionally deprived the Commissioner of an essential tool needed for the "efficient identification of overvalued property." *See id.* In fact, the Partnership complied with the reporting requirements of section 170(f)(11) when it timely filed its 2013 Form 1065 and attached Form 8283, which expressly disclosed the Partnership's relatively low adjusted basis ($3,521,827) in the Subject Property and, by comparison, its substantially higher amount claimed as a charitable contribution deduction ($47,750,000, which is an approximately 1,300% increase in value over the Partnership's original adjusted basis in the Subject Property). Moreover, section 170(f)(11)

**[\*60]** functioned as Congress intended with respondent being alerted to the Partnership's basis in the Subject Property and the value of the claimed charitable contribution, which resulted in the Partnership's return being examined and an FPAA being issued. We find the Partnership's compliance with its reporting obligations to stand in stark contrast to an intentional act, on its part, to conceal the underlying transaction from respondent.

Notwithstanding the Partnership's express disclosure, respondent asserts that it is still liable for the section 6663 civil fraud penalty on the basis that the Managers (1) knowingly understated income, (2) had the requisite education and knowledge to understand their fraudulent conduct, (3) engaged in a pattern of conduct specifically to mislead and conceal, (4) created and used false and misleading records, (5) failed to keep adequate and accurate records, (6) failed to cooperate with tax authorities in ascertaining the correct income, (7) were willing to defraud third parties and were dishonest in business transactions, and (8) made implausible and inconsistent explanations.

Although respondent has proffered some evidence of conduct that might give rise to a suspicion of fraud, most of the evidence concerns conduct unrelated to the Partnership's tax return. Respondent must prove by clear and convincing evidence that the Partnership intended to evade tax in filing the return. *See, e.g.*, *Holmes*, T.C. Memo. 2012-251, at \*31–32. On the basis of our review of the record, we find that respondent has failed to prove by clear and convincing evidence that the Partnership had the specific intent to evade tax when it filed its 2013 return.[26]

Consequently, we find that the evidence in the record does not establish an attempt by the Partnership to conceal or deceive respondent nor thwart his efficient collection of taxes. Therefore, the section 6663 civil fraud penalty is inapplicable in this case.

B.    *Section 6662 Accuracy-Related Penalty*

Section 6662(a) and (b)(1), (2), and (3) imposes an accuracy-related penalty equal to 20% of the portion of an underpayment that is attributable to "[n]egligence or disregard of rules or regulations," "[a]ny substantial understatement of income tax," and "[a]ny substantial

---

[26] Since some of respondent's alleged indicia of fraud were considered and rejected in *Mill Road 36 Henry LLC*, T.C. Memo. 2023-129, at \*60–64, we need not address them in detail again.

[*61] valuation misstatement," respectively. An understatement of income tax is a "substantial understatement" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. I.R.C. § 6662(d)(1)(A). There is a "substantial valuation misstatement" when the value of property claimed on the return is 150% or more of the correct amount. I.R.C. § 6662(e)(1)(A).

The penalty amount increases from 20% to 40% in the case of a "gross valuation misstatement," which occurs when the value of the property claimed on the return exceeds 200% of the correct amount. I.R.C. § 6662(h)(1) and (2)(A)(i). The taxpayer may not rely on a reasonable cause, good-faith defense against the imposition of the section 6662(h) penalty with respect to charitable contribution properties. *See* I.R.C. § 6664(c)(3); *Chandler v. Commissioner*, 142 T.C. 279, 293 (2014). However, no penalty shall be imposed unless the portion of the underpayment attributable to the valuation misstatement exceeds $5,000. I.R.C. § 6662(e)(2). Although an underpayment may trigger a penalty for more than one reason, the Commissioner may not impose more than one penalty on a single portion of the underpayment. Treas. Reg. § 1.6662-2(c).

Pursuant to a Stipulation of Settled Issues dated August 9, 2022, we find that respondent has established compliance with the procedural approval requirements of section 6751(b). Because we find the value of the Partnership's conservation easement donation to be $4,595,000, its original claimed valuation of $47,570,000 is more than 200% "of the amount determined to be the correct amount of such valuation." This triggers application of the 40% gross valuation misstatement penalty under section 6662(e)(1)(A) and (h). Consequently, we will sustain the 40% gross valuation misstatement penalty determined by respondent and need not address any potential reasonable cause defense, since none applies to this penalty.[27] *See* I.R.C. § 6664(c)(3); *Chandler*, 142 T.C. at 293.

VI.    *Conclusion*

For the 2013 tax year we hold that the Partnership is entitled to a charitable contribution deduction under section 170 of $4,595,000 for

---

[27] Since we have sustained respondent's imposition of the 40% gross valuation misstatement penalty against the Partnership, it is not necessary to address whether the alternative penalties for negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement should be imposed.

**[\*62]** its donation to SERLC of a conservation easement over approximately 1,545.79 acres of the Subject Property. We find that respondent has failed to prove the applicability of the section 6663 civil fraud penalty. However, we hold that the Partnership is liable for a 40% gross valuation misstatement penalty under section 6662(h).

We have considered all of the arguments that the parties have made, and to the extent they are not addressed herein, we find the arguments to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*